IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| GEOMETWATCH CORP., a Nevada corporation,<br><br>*Plaintiff*,<br><br>v.<br><br>ALAN E. HALL, *et al.*,<br><br>*Defendants*. | **MEMORANDUM DECISION AND ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR SUMMARY JUDGMENT AND DENYING AS MOOT THE PARTIES' DAUBERT MOTIONS AND MOTIONS IN LIMINE**<br><br>Case No. 1:14-cv-00060-JNP<br><br>District Judge Jill N. Parrish |

This matter comes before the court on the Motion for Summary Judgment filed on November 3, 2017 by Defendants Alan E. Hall, Tempus Global Data, Inc., and Island Park Group of Companies, LLC (the "Hall Defendants"). (ECF No. 524).[1] Plaintiff, GeoMetWatch Corp. ("GeoMet") filed an opposition to the motion on January 22, 2018, (ECF No. 553), to which the Hall Defendants replied on March 23, 2018, (ECF No. 571). GeoMet also filed a Motion for Consideration of Supplemental Material, which the court hereby grants, and has considered as part of this motion. (ECF No. 691).

The court held a hearing on this motion on July 27, 2018. On the basis of that hearing, the parties' memoranda and associated exhibits, a review of relevant law, and for the reasons below, the Hall Defendants' Motion for Summary Judgment is granted in part and denied in part.

---

[1] Defendants Utah State University Research Foundation ("USURF") and Advanced Weather Systems Foundation ("AWSF") have filed separate motions for summary judgment that rely on the arguments advanced in this motion insofar as they relate to plaintiff's theories of causation of lost profits. (ECF Nos. 585, 607).

# I. STATEMENT OF FACTS

## A. DEVELOPMENT OF THE GIFTS SENSOR

In the early 2000s, the Utah State University Research Foundation ("USURF") developed a new weather system sensor. The development of the sensor—the Geosynchronous Imaging Fourier Transform Spectrometer, or the GIFTS sensor for short—was funded by the National Aeronautics and Space Administration ("NASA") and the National Oceanic and Atmospheric Administration ("NOAA"). The GIFTS sensor was designed to provide high-resolution atmospheric data that would significantly improve weather forecasting.

## B. GEOMET'S VISION

David Crane and Gene Pache founded GeoMet in 2008. They envisioned that GeoMet would employ sensors, like the GIFTS sensor, that would provide unique and proprietary weather data. To this end, GeoMet obtained a verbal commitment from NASA that GeoMet could have the GIFTS sensor.

In September 2010, GeoMet received a remote sensing license from the Department of Commerce and NOAA (the "NOAA license"). GeoMet was the first company to obtain this type of license. The NOAA license allows GeoMet to operate up to six satellite sensors, like the GIFTS sensor, in geosynchronous orbit, take detailed weather observations, and commercialize the data.

## C. USURF AGREES TO BUILD THE STORM SENSOR

Beginning in late 2009 and early 2010, before GeoMet obtained the NOAA License, GeoMet had discussions with USURF. GeoMet and USURF discussed whether USURF could build a commercial version of the GIFTS sensor. The commercial version of the GIFTS sensor is called the Sounding and Tracking Observatory for Regional Meteorology or the STORM sensor for short. USURF eventually agreed to build the STORM sensor.

GeoMet and USURF entered into a number of agreements concerning the STORM sensor. One of those agreements was the Preferred Service Provider Agreement. In April 2013, GeoMet and USURF terminated the Preferred Service Provider Agreement so that Utah State University Advanced Weather System Foundation ("AWSF"), a subsidiary of USURF, could take responsibility for building the STORM sensor.

### D. GEOMET OBTAINS LETTERS OF INTENT AND MEMORANDA OF UNDERSTANDING

Throughout 2011 and afterwards, GeoMet worked to identify potential customers that were willing to execute letters of intent and memoranda of understanding. This was an expensive and time-consuming process. GeoMet, in 2011, entered into a nonbinding License and Services Agreement with ChinaRS Geoinformatics. This agreement reflects that ChinaRS was willing to buy $8.9 million of weather data per month (*i.e.*, $108 million per year). Ultimately, however, ChinaRS entered into a contract with GeoMet under which it committed to purchase only $300,000 of weather data per month (*i.e.*, $3.6 million per year). GeoMet obtained multiple other letters of intent, but none led to the execution of firm commitments.

### E. ASIASAT AND THE PROPOSED EXIM LOAN

AsiaSat, a foreign entity based in Hong Kong, operates satellites and sells space on its satellites to broadcasting and telecommunication companies. In early 2012, GeoMet and AsiaSat began to discuss whether AsiaSat could host the STORM sensor on one of its satellites. Specifically, GeoMet and AsiaSat discussed whether AsiaSat could host the STORM sensor on a satellite referred to as AsiaSat 9.

GeoMet and AsiaSat also discussed whether AsiaSat could use its balance sheet to secure a loan of about $170 million from the Export-Import Bank of the United States (the "EXIM Bank").[2] GeoMet planned to use the loan proceeds to pay for the STORM sensor.

Because of the high cost associated with constructing, launching, and hosting the STORM sensor, AsiaSat was concerned about its "exposure" in doing a deal with GeoMet. Specifically, AsiaSat was worried that it would take out a loan with the EXIM Bank, GeoMet's business would fail, and AsiaSat "would be on the hook to pay off the debt."

Because of these concerns, GeoMet and AsiaSat came to an understanding that, before AsiaSat would agree to take out a loan from the EXIM Bank, GeoMet would be required to provide a guarantee or "backstop" that would secure AsiaSat in the event that GeoMet was unable to pay back the loan. According to AsiaSat's CEO, "[t]he key element was always [that GeoMet] provide a guarantee that eliminated [AsiaSat's] risk . . . ."

In early 2013, AsiaSat commenced the initial application steps for securing a loan from the EXIM Bank (the "Proposed EXIM Loan").[3] The loan application listed a special purpose vehicle that was 100 percent owned by AsiaSat as the "borrower." The loan application listed GeoMet as the domestic "exporter." AsiaSat represented that the total cost of venture was $168 million, though AsiaSat applied for a loan of only $125 million because the EXIM Bank was unwilling to finance more than 85 percent of the venture's cost.

---

[2] As EXIM Bank's 30(b)(6) deponent explained: "AsiaSat was the borrower, [the] primary source of repayment. The analysis on the credit worthiness on the borrower was done based on AsiaSat's balance sheet, [which was a] good, strong balance sheet." Fogt Dep. Tr. 246:3–16.

[3] EXIM Bank provides financing to international borrowers who buy export goods from the United States. So AsiaSat, as opposed to GeoMet, had to submit the loan application to the EXIM Bank. In fact, the EXIM Bank was unable to structure a loan with GeoMet, a domestic entity, as the borrower.

## F. AsiaSat and The Cooperation Agreement

In 2012 and early 2013, GeoMet expressed a desire to enter into a formal agreement with AsiaSat. GeoMet believed that a formal agreement would legitimize the cooperation between the two companies, making it easier for GeoMet to obtain guarantees for the Proposed EXIM Loan.

On April 3, 2013, GeoMet and AsiaSat executed a Cooperation Agreement. Under the Cooperation Agreement, AsiaSat agreed to use "reasonable efforts" to cause the EXIM Bank to close the Proposed EXIM Loan. But before AsiaSat was required to do so, GeoMet was required to meet certain conditions, two of which are relevant here. Section 2.2.1 of the Cooperation Agreement provides:

> "[t]he obligation of AsiaSat . . . to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment or AsiaSat's . . . waiver of each of the following conditions: . . .
>
> (b) AsiaSat . . . shall have received from [GeoMet] the Convertible Note duly executed by an authorized officer of [GeoMet], which Convertible Note shall be in full force and effect on the Effective Date; [and]
>
> (c) AsiaSat . . . shall have received legally valid and binding guarantees and/or other credit support (including letters of credit) in favor of AsiaSat . . . given by a guarantor (or bank, in the case of letters of credit) acceptable to AsiaSat . . . in [its] sole and absolute discretion and, in each case, in form and substance satisfactory to AsiaSat . . . in [its] sole and absolute discretion, which shall guarantee the full performance and payment of the obligations of [GeoMet] . . . hereunder (i) in respect of the Right to Use Fee[4] (which credit support shall be referred to as the 'Right to Use Credit Support'), and (ii) under the Convertible Note (which credit support shall be referred to as the 'Convertible Note Credit Support' and collectively with the Right to Use Fee Credit, the 'Credit Supports'), which Credit Supports shall be in full force and effect on the Effective Date . . . ."

One of the purposes of the Convertible Note described in Section 2.2.1(b) was to provide AsiaSat a mechanism to obtain equity in GeoMet. But GeoMet's attorneys were "against" GeoMet issuing a convertible note to AsiaSat because it would make the STORM collateral for

---

[4] The "Right to Use Fee" is the quarterly fee GeoMet would pay to AsiaSat to cover, in essence, the principal and interest payments associated with the Proposed EXIM Loan.

the Proposed EXIM Loan. And GeoMet knew that "NOAA would not accept that." AsiaSat nevertheless refused to "back off" on the convertible-note requirement. Eventually, GeoMet's attorney refused to approve the convertible note because it was "too onerous."

The CEO of AsiaSat described GeoMet's obligation to provide a guarantee or backstop for the Proposed EXIM Loan as "the basis for the agreement" and a "key element" of the Cooperation Agreement. GeoMet also understood that obtaining a guarantee or backstop for the Proposed EXIM Loan was "critical" to AsiaSat.

Under the Cooperation Agreement, AsiaSat could terminate the agreement "at any time after the Cut-off Time, by written notice to [GeoMet], if the conditions set forth in Article 2.2.1 . . . [were] not fulfilled on or prior to the Cut-off Time." The Cut-off Time was July 31, 2013. GeoMet and AsiaSat agreed that the Cut-off Time could only be modified by a written agreement.

### G. GEOMET'S DEALINGS WITH AWSF

In April 2013, after GeoMet and USURF terminated the Preferred Service Provider Agreement, GeoMet and AWSF entered into a Preferred Provider Agreement. The Preferred Provider Agreement provides that GeoMet "shall enter into, maintain, and fulfill . . . the October 1, 2013 [Storm 001 Contract]" and that "[m]aintenance of the . . . contract specifically includes complying with the payment schedule set forth [in the contract]."

Under the Preferred Provider Agreement, AWSF could terminate the agreement by giving written notice of default to GeoMet if, among other things, GeoMet failed to comply with the payment schedule set forth in the Storm 001 Contract. The termination would be effective thirty days after AWSF provided written notice unless GeoMet cured the default.

On October 1, 2013, GeoMet and AWSF executed the STORM 001 Contract referenced in the Preferred Provider Agreement. The STORM 001 Contract contains a payment schedule

under which GeoMet was required to "ensure adequate funding to comply with the Milestone Payment Schedule."

Under the Milestone Payment Schedule, GeoMet was required to pay to AWSF a total of $124,933,872. GeoMet was required to make its first payment of $5,384,022 on January 6, 2014. GeoMet knew that AWSF could not build the STORM sensor unless GeoMet provided the funding.

The Storm 001 Contract defined an "Event of Default" as, among other things, when "GeoMetWatch fails to pay when due any amount payable under th[e] contract." "During the continuance of any Event of Default, AWSF may, by notice to [GeoMet], (i) discontinue performing its obligations under th[e] contract, and (ii) terminate th[e] contract."

### H. ASIASAT HALTS THE EXIM LOAN PROCESS

In July 2013, it became apparent that GeoMet would not be able to provide a guarantee or backstop for the Proposed EXIM Loan before the July 31, 2013, Cut-off Time. Accordingly, AsiaSat and GeoMet extended the Cut-off Time to September 30, 2013.

On July 29, 2013, AsiaSat informed GeoMet that it was not filing the Federal Register notice for the Proposed EXIM Loan and that it was not going to submit the Proposed EXIM Loan to the EXIM Bank for board approval.[5] AsiaSat chose not to submit the Proposed EXIM Loan for board approval because it "did not have the guarantees as required [by the Cooperation Agreement]." As AsiaSat's CEO explained, "[T]o submit [the Proposed EXIM Loan] to EXIM for approval, the guarantees had to be in place."

---

[5] The EXIM Bank, as a matter of lending protocol, requires two board meetings before it will approve a loan that exceeds $100 million. The first board meeting provides the preliminary approval, and the second board meeting provides the final approval.

AsiaSat informed GeoMet that "[t]he only outstanding thing [was] the guarantee, which is also the most sensitive one. [AsiaSat] would proceed with the filing to the Federal Register as soon as [it] ha[d] more clarity on the guarantee." AsiaSat's CEO informed GeoMet in an email:

> We have delayed the submission of the register filing with EXIM until we have the guarantee sorted out. The deal is still on and the process is still intact. . . . As soon as we notify EXIM to proceed, they will submit the filing to the registry and our deal will be on the agenda for the next Board meeting 10 days later. Nothing has changed, the key driver is still the guarantee. . . .

In August 2013, GeoMet had still not been able to obtain the required guarantee and AsiaSat told the EXIM Bank to stop entirely the process related to the Proposed EXIM Loan. GeoMet discussed with AsiaSat alternatives whereby GeoMet would not be required to meet its obligations set forth in the Cooperation Agreement. But AsiaSat did not agree to any of the proposed alternatives.

In September 2013, AsiaSat and GeoMet again extended the Cut-off Time, to November 30, 2013. On November 24, 2013, a week before the Cut-off Time, GeoMet asked AsiaSat if there were "another way to structure the deal" and if "AsiaSat would support [AWSF] for a month or two." AsiaSat informed GeoMet that it was "unable to engage any funds nor . . . willing to trigger the Ex-Im loan until a guarantee is in place . . . ."

As of November 30, 2013, GeoMet had neither provided to AsiaSat the Convertible Note (as was required by Section 2.2.1(b) of the Cooperation Agreement), nor a guarantee or backstop for the Proposed EXIM Loan (as was required by Section 2.2.1(c) of the Cooperation Agreement). Because of GeoMet's inability to meet these requirements, AsiaSat did not proceed with the approval process for the EXIM Loan.

## I.   THE HALL DEFENDANTS

On September 20, 2013, shortly after GeoMet and AsiaSat extended the Cut-Off Time a second time, GeoMet's attorney introduced GeoMet's then-CEO to Alan Hall. AWSF and

USURF encouraged GeoMet to meet with Mr. Hall because they believed that he could provide the backstop funding for the Proposed EXIM Loan or locate someone who could. AWSF and USURF assured GeoMet that Mr. Hall was required to treat information related to the STORM sensor as confidential. Accordingly, GeoMet made confidential business and technical information available to Mr. Hall and his team.[6]

On November 3, 2013, Mr. Hall sent an email to AsiaSat's CEO. Mr. Hall explained that GeoMet was "in trouble" and that it was contractually obligated to pay AWSF $6 million on January 6, 2014, and another $8 million in February. Mr. Hall further explained that he was prepared to obtain a NOAA license, similar to GeoMet's, if GeoMet failed to pay AWSF. Mr. Hall proposed that he and AsiaSat become equal partners in a business of which Mr. Hall would own 42 percent and AsiaSat would own 42 percent. Utah State University ("USU") would own 1 percent, and employees would own 15 percent (in the form of stock options). Finally, Mr. Hall wrote: "USU and [AWSF] love this plan and will happily discuss it with you. I have not broached this matter with [GeoMet] and ask you to not speak with me in the near term."[7]

Three days later, on November 6, 2013, GeoMet and Mr. Hall, on behalf of Island Park, executed a Mutual Non-Disclosure Agreement (the "Mutual NDA"). Under the Mutual NDA, Island Park agreed that it would use GeoMet's confidential information only to facilitate "technical and commercial discussions relating to the development and distribution of environmental observation systems and/or services of GeoMetWatch." Island Park further agreed

---

[6] The members of Mr. Hall's team are Erin Housley, Brent Keller, Mark Hurst, Debbie Wade, Alison Wistner, and Scott Jensen.

[7] Although the relevant exchange at Mr. Hall's deposition is not without ambiguity, it appears that Mr. Hall testified that "me" was a typographical error, and that he intended to ask AsiaSat not to speak with *GeoMet* in the near future. *See* Hall Dep. Tr. 113–14.

that it would "not disclose to any other person or entity any Confidential Information, or that discussions are taking place between the parties concerning the Confidential Information . . . ."

## J. AWSF TERMINATES THE STORM 001 CONTRACT AND THE PREFERRED PROVIDER AGREEMENT

On January 6, 2014, GeoMet failed to make the first milestone payment of $5,384,022 to AWSF. The next day, AWSF notified GeoMet that its failure to make the $5,384,022 payment constituted (1) an Event of Default under the Storm 001 Contract and (2) a material breach of the Preferred Provider Agreement. Consequently, AWSF notified GeoMet that it was (1) terminating the Storm 001 Contract and discontinuing performance under the contract and (2) terminating the Preferred Provider Agreement on the condition that GeoMet did not cure the breach within thirty days. GeoMet failed to cure the breach, and AWSF terminated the Preferred Provider Agreement.

## K. GEOMET RENEWS TALKS WITH ASIASAT

In January 2014, AsiaSat and GeoMet discussed the status of AsiaSat 9 and deployment of the STORM sensor. At this time, AsiaSat notified GeoMet that the terms of the Cooperation Agreement still applied to any potential deal between the two entities. AsiaSat and GeoMet did not agree to extend the Cut-off Time.

## L. GEOMET REACHES OUT TO ITT

GeoMet's founders, Messrs. Crain and Pache, previously worked for a manufacturing company called ITT. Sometime in early 2012, GeoMet discussed with ITT whether ITT could act as either the primary or secondary source for construction of the STORM sensor. In February of 2014, following its termination by AWSF, GeoMet approached AsiaSat with a proposal involving ITT constructing the sensor. But AsiaSat indicated that it would need something

concrete from ITT before it considered whether to re-engage GeoMet before the AsiaSat 9 launch.

ITT was concerned about GeoMet's "financial backing to pay [ITT] to go forward with [building] an instrument." ITT believed that GeoMet was "running out of money and desperate using [ITT] to get money from Asia to survive." ITT never agreed to act as a guarantor for the Proposed EXIM Loan.

In February 2014, GeoMet entered into a Time and Materials Purchase Agreement with ITT. ITT agreed to "figure out integration of its existing [sensor] model with what [GeoMet] needed." In exchange, GeoMet agreed to pay ITT $500,000. The Time and Materials Purchase Agreement was not an agreement to construct a STORM sensor, or any other type of sensor.

In March 2014, GeoMet, together with ITT management, met with AsiaSat. GeoMet presented the idea that ITT would construct the STORM sensor. AsiaSat rejected the proposal and made no commitment to GeoMet. AsiaSat believed that switching sensor providers was risky and "that it was problematic the guarantee was still not in place." AsiaSat never agreed to launch a sensor built by ITT. In April 2014, ITT recognized that a hurdle to GeoMet creating a viable venture included "[h]aving the sufficient investment and funding to go forward with the project."

## M. AsiaSat Formally Terminates the Cooperation Agreement

On April 16, 2014, AsiaSat formally terminated the Cooperation Agreement. According to AsiaSat's CEO, the Hall Defendants did not pressure AsiaSat to terminate the Cooperation Agreement. AsiaSat's decision was unrelated to the Hall Defendants. ITT learned that AsiaSat terminated the Cooperation Agreement and understood that AsiaSat did so based on GeoMet's inability to raise capital.

### N.  TEMPUS

Tempus was formally created on December 20, 2013. The Hall Defendants used GeoMet's confidential information to create for Tempus the same types of documents that were in existence for GeoMet: the Tempus Executive Summary, the Tempus Business Plan, the Tempus Revenue Model, a NOAA License Application, and the Commercial Weather Market Data Report.

One of the members of Mr. Hall's team explained that she "happened to download a [GeoMet] business plan before [GeoMet] took it down." She went on to explain that she would "pull information from [GeoMet's business plan]," knowing that Tempus would need to "re-word and personalize it to Tempus." Tempus used GeoMet's revenue models to create financial models for Tempus. And Tempus, like GeoMet, obtained a license from NOAA, pursued a business relationship with AsiaSat, and sought to obtain a loan from the EXIM Bank.

On April 1, 2014, Tempus announced that it had opened operations in Utah to deliver a hyperspectral weather sensor and that it was in the final stages of securing a NOAA license. On April 25, 2014, Mr. Hall, Tempus, AWSF, and others filed suit against GeoMet, claiming to own the intellectual property at issue in this case.

### O.  GEOMET RUNS OUT OF MONEY

In May 2014, GeoMet ran out of money. No further investments were made in GeoMet. In June 2014, ITT ordered its employees to stop work related to the Time and Materials Purchase Agreement because GeoMet had not made the payments required under the agreement.

In September 2014, ITT would have been willing to proceed with GeoMet had there been a credible source of funding. GeoMet resumed discussions with ITT in 2015, but nothing resulted from the discussions.

## P. TEMPUS CEASES OPERATIONS

Around June 2016, Tempus ceased all operations. Since then, Tempus has not pursued any business opportunities and has no employees and no operating capital. Tempus never generated revenue. Tempus never paid a salary, dividend, distribution, or compensation of any kind.

## II.    SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the initial burden of demonstrating the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant has met this burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (citation omitted). To do so, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

When the nonmoving party bears the burden of proof at trial on a dispositive issue, that party must "go beyond the pleadings" and designate specific facts so as to "make a showing sufficient to establish the existence of an essential element to that party's case." *Celotex*, 477 U.S. at 322. "[T]he plain language of Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Liberty Lobby, Inc.*, 477 U.S. at 249. And, "[t]o defeat a motion for summary judgment, evidence, including testimony, must be based on more than mere speculation, conjecture, or surmise." *Pioneer*

*Ctrs. Holding Co. Emp. Stock Ownership Plan & Tr. v. Alerus Fin., N.A.*, 858 F.3d 1324, 1334 (10th Cir. 2017) (quoting *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004)).

Finally, summary judgment is not a "disfavored procedural shortcut" but rather "an integral part of the Federal Rules as a whole" that is designed "to secure the just, speedy and inexpensive determination of every action." *Celotex*, 477 U.S. at 322. (quoting Fed. R. Civ. P. 1).

### III.    DISCUSSION

The Hall Defendants argue that there is insufficient evidence of causation to sustain a damages award for lost profits. Specifically, the Hall Defendants seek a ruling that, as a matter of law, GeoMet cannot recover lost profits damages under any of its claims for relief.

GeoMet's Second Supplemental Damages Disclosure articulates the three damages theories under which it seeks lost profits damages. While the Hall Defendants identify specific defects in each theory, their general argument is that GeoMet cannot adduce evidence from which a reasonable jury could conclude that the Hall Defendants were the cause of GeoMet's alleged lost profits.[8] The Hall Defendants also move for summary judgment on GeoMet's unjust enrichment theory of damages on grounds that the Hall Defendants have obtained no benefit from their alleged misappropriation of trade secrets.

---

[8] Specifically, the moving defendants seek summary judgment on the issue of causation of lost profits in connection with the following claims: breach of contract against Island Park, civil conspiracy against Island Park and Tempus, and violation of Utah's Uniform Trade Secrets Act against the Hall Defendants. On the remaining three claims (violation of Section 43(a) of the Lanham Act against Tempus, violation of Utah's Truth in Advertising Act against Tempus, and violation of Utah's Unfair Practices Act against Tempus), the moving defendants seek summary judgment on grounds that GeoMet failed to provide, in its initial disclosures, computations of the nominal and statutory damages it seeks. Mr. Hall alternatively moves for summary judgment on GeoMet's Uniform Trade Secrets Act claim on grounds that there is insufficient evidence to establish a prima facie claim against him for misappropriation of trade secrets. Because the court grants summary judgment based on a lack of evidence of causation, it does not address this alternative argument.

During oral argument on this motion, the court questioned whether a ruling on the admissibility of plaintiff's expert testimony might facilitate resolution of the motion. But after reviewing plaintiff's experts' reports, the court has concluded that plaintiff's expert testimony is not material to the resolution of this motion because the evidence in this case is simply insufficient to support a conclusion that the defendants caused GeoMet any damage. Stated differently, even assuming that a *Daubert* hearing on GeoMet's experts resulted in a ruling that their opinions were admissible, those opinions are insufficient to establish a causal nexus between defendants' conduct and GeoMet's claim for lost profits. Consequently, in pursuit of the "just, speedy, and inexpensive determination" of this action, the court declines to hold *Daubert* hearings, finding that they could not alter the court's conclusion that the Hall Defendants are entitled to summary judgment on the issue of damages. *See* Fed. R. Civ. P. 1. The *Daubert* motions are therefore denied as moot. (ECF Nos. 626, 628, 632, 636, 641, 643, 648, and 652).

GeoMet and its experts concede that the expert testimony they seek to present at trial is based on certain assumptions. For example, the expert opinions simply "assume" that GeoMet would have been able to secure funding for its venture despite its inability to do so before the Hall Defendants arrived on the scene.[9] As explained below, this assumption and others like it rely on nothing more than speculation and conjecture that is, in critical respects, directly at odds with the observed conditions faced by GeoMet before the Hall Defendants entered the picture.

Setting aside the speculation inherent in GeoMet's damages theories, there remains a lack of evidence suggesting that the *cause* of the venture's failure was the conduct of the defendants. With one exception, GeoMet's experts do not opine that the defendants' conduct was the cause

---

[9] Those opinions that do not rely on this assumption of funding instead "assume" that two as-of-yet unascertained entities—a partner and a lender—would be persuaded to do what GeoMet's actual partner and lender would not.

of the lost profits GeoMet seeks,[10] presumably because there is no non-speculative basis for such an opinion.

In short, the testimony GeoMet's experts seek to offer (as well as the testimony of the experts offered by defendants in response) is material only if the defendants' conduct caused GeoMet's lost profits. But the evidence supporting this conclusion is deficient and requires resort to speculation and conjecture that is inconsistent with observed events and the uncontroverted testimony of third parties. Thus, the expert testimony GeoMet proffers cannot defeat summary judgment.[11]

---

[10] The contested GeoMet experts are Mark Piegza, Rick Hoffman, Jozsef Szamosfalvi, and Matthew O'Connell. Mark Piegza, an expert retained by GeoMet to opine on the three damages theories discussed below, expressly states in his report that the causal connection between the defendants' conduct and AsiaSat's decision to terminate the cooperation agreement is not relevant to his opinion. He further testified in deposition that the role of the defendants' conduct is outside the scope of his opinion. Similarly, Rick Hoffman, GeoMet's damages expert, explains that "the link between the alleged harmful conduct and the damage measure is based on disputed questions of fact that are outside my expertise." Jozsef Szamosfalvi is the former CFO of GeoMet who was retained to further opine on the three damages theories discussed below, especially as they relate to the revenue models he helped create while employed at GeoMet. But his expert report does not discuss how the defendants' conduct caused the alleged lost profits. The closest any of GeoMet's experts comes to linking the conduct of the defendants to the failure of the venture is Matthew O'Connell's assertion that the public announcement of Tempus' creation in April of 2014 destroyed GeoMet's "first-mover" advantage, thereby frustrating any further funding opportunities for GeoMet. But this opinion is facially speculative and "is not supported by sufficient facts to validate it in the eyes of the law." *Brooke Grp. Ltd. V. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993). Mr. O'Connell concludes that "[t]he fact that GeoMetWatch was no longer the only proposed provider of the type of data to be offered would have substantially reduced any interest by prospective investors or lenders." But he does not opine that GeoMet could have obtained funding absent the loss of the "first-mover" advantage, and provides no reason why the market for commercial weather forecasting data derived from hyperspectral sensors could consist of only a single entity, or even why he believes that private and public capital might take that view. Additionally, he fails to offer any facts to support his conclusion that it was the loss of the "first-mover" advantage that caused GeoMet's failure to secure funding in 2014 to the exclusion of other equally plausible explanations. As a result, this opinion must be excluded under Rule 702 of the Federal Rules of Evidence.

[11] The admissibility of the testimony of Armand Musey—USURF's expert in support of its counterclaim against GeoMet—is not affected by this order. GeoMet's motion to exclude his testimony, (ECF No. 622), remains pending.

## A.  LOST PROFIT DAMAGES

Under Utah law, "[l]ost profits must be established with reasonable certainty." *Cook Assocs., Inc. v. Warnick*, 664 P.2d 1161, 1165 (Utah 1983). This requires "proof of 'sufficient certainty that reasonable minds might believe from a preponderance of the evidence that the damages were actually suffered.'" *Id.* (quoting *First Sec. Bank of Utah v. J.B.J. Freeyards, Inc.*, 653 P.2d 591, 596 (Utah 1982)). This requirement applies to proof of (1) the fact of lost profits, (2) causation of lost profits, and (3) the amount of lost profits. *Id.*

"The basic and general rule is that loss of anticipated profits of a business venture involve so many factors of uncertainty that ordinarily profits to be realized in the future are too speculative to base an award of damages thereon." *First Sec. Bank*, 653 P.2d at 596. While this is the general rule, the "pivotal question is not whether the plaintiff has proven an established earning record but whether he has proven the damages for lost profits with reasonable certainty, although the former is often relevant to the latter." *Cook Assocs.*, 664 P.2d at 1166.

"A record of past earnings obviously increases the certainty with which one could predict future profits." *Id.* "But that fact should not automatically preclude new businesses from recovering lost profits . . . ." *Id.* Instead, "new businesses should be allowed to try to prove lost profits up to a reasonable level of certainty by other means, just as established businesses are permitted to do." *Id.* These means include "expert testimony of profit potential, evidence of the actual profits of similar businesses, and evidence of subsequent earnings of the business claiming lost profits." *Id.* at 1166 n.4.

Whether a defendant caused lost profits "is generally determined by an examination of the facts, and questions of fact are to be decided by the jury." *Mahmood v. Ross*, 990 P.2d 933, 938 (Utah 1999). "However, this does not mean that a jury is free to find a causal connection between a breach and some subsequent injury by relying on unsupported speculation." *Id.* And

"[w]hen an injury may have come from either one of two causes, either of which may have been the sole proximate cause, it devolves on the plaintiff to prove by a preponderance of the evidence that the cause for which the defendant was liable was culpable and the proximate cause." *Tremelling v. S. Pac. Co.*, 170 P. 80, 84 (Utah 1917) (quoting *Edd v. Union Pac. Coal Co.*, 71 P. 215 (Utah 1903)).

Put another way, while a jury may make "deductions based on reasonable probabilities, 'the evidence must do more than merely raise a conjecture or show a probability [as to proximate cause].'" *Mahmood*, 990 P.2d at 939 (quoting *Sumsion v. Streator-Smith, Inc.*, 132 P.2d 680, 683 (Utah 1943)). "Where there are probabilities the other way equally or more potent[,] the deductions are mere guesses and the jury should not be permitted to speculate." *Id.* (citation omitted). Thus, "where 'the proximate cause of the injury is left to conjecture, the plaintiff must fail as a matter of law.'" *Id.* (citation omitted). And though Utah law tolerates some uncertainty in fixing the amount of lost profits in favor of a start-up venture, this relaxed standard is triggered only once causation has been established. *See Kilpatrick v. Wiley, Rein & Fielding*, 37 P.3d 1130, 1146 (Utah 2001).

By its own admission, GeoMet's success in this venture required the cooperation of at least three other distinct entities: The EXIM bank, a commercial satellite partner (necessary both to host the instrument and to serve as the primary borrower for an EXIM loan), and an entity to construct the instrument.[12] But the actual behavior of some of these third parties was inconsistent

---

[12] The least speculative path to funding actually required at least one more entity—and very likely several—to secure backstop funding before AsiaSat would submit the loan for EXIM board approval. GeoMet has suggested that USU had repeatedly offered to serve as this backstop. But the uncontroverted deposition testimony of AsiaSat's CEO, Bill Wade, is that AsiaSat rejected USU as a guarantor—as part of a "take-or-pay" agreement—because of the problematic optics of suing a state university in the event of default. *See* Wade Dep. Tr. 105:1–106:2. And, satisfying the backstop funding condition precedent would likely have required the

with how GeoMet assumes they would have behaved, and others are unascertained entities, having been apparently plucked from thin air by GeoMet and its experts as part of a causation theory that can only be described as speculative. As explained below, all three causation theories advanced by GeoMet fail because they each rely on the occurrence of one or more contingencies that cannot be established absent speculation.

1. *The First Damages Theory*

GeoMet describes its first damages theory as follows:

> [GeoMet's] first measure of damages is the loss of the business opportunity as it was structured going into the Fall of 2013, under which [GeoMet] and AsiaSat would obtain a loan from [the] EXIM Bank, to fund the project, with [AWSF] building [the STORM sensor]. But for [defendants'] wrongdoing, [GeoMet] would have completed the transaction on this basis.

In short, under its first theory, GeoMet contends it lost profits because the Hall Defendants prevented it from launching an AWSF-built STORM sensor on an AsiaSat satellite.

To have realized this opportunity, GeoMet needed AsiaSat to obtain a loan in excess of $100 million from the EXIM Bank. GeoMet would have used the proceeds from the loan to pay AWSF to build the STORM sensor. AsiaSat and GeoMet entered into the Cooperation Agreement under which AsiaSat agreed to use reasonable best efforts to obtain the Proposed EXIM Loan. But before AsiaSat was required to do so, GeoMet had to satisfy certain requirements, two of which are relevant here.

---

cooperation of multiple other entities. The materialization of such agreements is highly speculative considering that, despite months of focused and persistent effort to secure the required backstop—knowing that it represented an absolute barrier to funding the construction of the instrument—GeoMet obtained only one firm commitment for $3.6 million per year. Even assuming that agreement would have been acceptable to AsiaSat "in its sole discretion," GeoMet would have needed dozens of such agreements to satisfy the backstop requirement.

First, GeoMet was required to provide a backstop or guarantee for the Proposed EXIM Loan. This was a "key element" of the Cooperation Agreement because AsiaSat was unwilling to take out a loan in excess of $100 million unless GeoMet guaranteed repayment of the loan.

GeoMet appears to concede that it could not have obtained the required backstop. That is, GeoMet does not argue that it would have been able to obtain the backstop but for the Hall Defendants' actions. And there is no evidence that GeoMet was even partially successful in obtaining the backstop. Instead, GeoMet argues that the requirement was "flexible" and that AsiaSat, before the Hall Defendants interfered, was willing to remove it altogether. But the evidence on which GeoMet relies does not support its position.

First, GeoMet relies on a declaration from its president, David Crain, in which he states that "[p]rior to the Hall Defendants' introduction to [GeoMet], [AsiaSat officers] discussed . . . AsiaSat requiring less than the full backstop, or possibly waiving that condition entirely." Notably, this says nothing about whether AsiaSat was *actually* willing to require less than the full backstop or guarantee—it simply says that the matter was discussed. Put simply, Mr. Crain's declaration does not support the assertion that AsiaSat *was* willing to waive or reduce the backstop requirement. *See* Fed. R. Civ. P. 56(c)(1).

More importantly, the notion that AsiaSat was willing to waive or reduce the backstop requirement is contradicted by the deposition testimony of AsiaSat's then-CEO, Bill Wade, which is corroborated by contemporaneous email communications between Mr. Wade and GeoMet. Mr. Wade testified that the backstop requirement was "the key factor" of the Cooperation Agreement and that AsiaSat's board was not willing to "assum[e] the risk of a default on the EXIM loan." From the start, AsiaSat required a "watertight commitment that [it]

[would] receive the necessary funds to make the EXIM repayments." In short, Mr. Wade made clear that AsiaSat was not willing to waive or reduce the backstop requirement.

Second, GeoMet relies on an email chain between Mr. Wade and Mr. Hall in its attempt to show that the backstop requirement was flexible. Mr. Hall asked whether it would be possible for him to "work directly with the Ex Im Bank" and noted that he "would assume the obligations." Mr. Wade responded, "As a US entity, you would not be able to work with EXIM. They only work with foreign companies for the export of US produced products." He went on, "If you are willing to explore the loan obligation[,] we can certainly work with you to come up with a workable solution that will kick start the project. I think once we confirm a number of commitments, the guarantee could be reduced and ultimately removed before any risk attaches."

In short, Mr. Wade suggests that AsiaSat was willing to reduce or remove the backstop requirement if (1) Mr. Hall was "willing to explore the loan obligation" and (2) AsiaSat "confirm[ed] a number of commitments." At best, the email suggests that AsiaSat was "flexible" with the backstop requirement if certain events transpired. But GeoMet has no evidence that it provided "a number of commitments" to AsiaSat, and everything Mr. Wade said was in response to Mr. Hall's suggestion that he would "assume the obligations."

The email does not support GeoMet's assumption that AsiaSat was willing to reduce or waive the backstop requirement without receiving anything in exchange. GeoMet simply reads eight words from the email—"the guarantee could be reduced and ultimately removed"—out of context. And most notably, the entire exchange took place *after* Mr. Hall had been introduced to GeoMet and AsiaSat. Consequently, the email does not support the assertion that "prior to the Hall Defendants' introduction to [GeoMet], AsiaSat discussed with [GeoMet] requiring less than the full backstop, or possibly waiving it altogether." *See* Fed. R. Civ. P. 56(c)(1). Indeed, the

email suggests that AsiaSat was willing to require less than the full backstop *after* Mr. Hall was introduced to GeoMet.

In short, GeoMet has been unable to identify any admissible evidence that AsiaSat was willing to reduce or remove the backstop requirement. And GeoMet has no evidence that it would have been able to satisfy this requirement. Therefore, the undisputed facts establish that GeoMet was unable to launch an AWSF-built satellite on an AsiaSat satellite not because of anything the Hall Defendants did but rather because GeoMet was unable to obtain a sufficient backstop for the Proposed EXIM Loan.

Second, GeoMet was required to provide AsiaSat with a convertible note. The purpose of this was to provide AsiaSat a mechanism through which it could obtain equity in GeoMet. AsiaSat would provide a loan to GeoMet and the debt from the loan could be converted, at some later point, into GeoMet stock.

But GeoMet's attorneys were "against" GeoMet issuing a convertible note to AsiaSat because it would pledge the STORM sensor as collateral for the Proposed EXIM Loan. And GeoMet knew that "NOAA would not accept that." AsiaSat nevertheless refused to "back off" on the convertible-note requirement. Eventually, GeoMet's attorney indicated that he would not approve the convertible note because it was "too onerous."

In its opposition memorandum, GeoMet does not even address whether it would have been able to provide a convertible note to AsiaSat.[13] Thus, even assuming that AsiaSat were

---

[13] GeoMet did file a Motion for Consideration of Supplemental Material, (ECF No. 691), to respond to what GeoMet viewed as defense counsel's misrepresentations at oral argument regarding the convertible note. In response to the court's inquiry into whether there was "any testimony by any GeoMet officer or employee that indicates [GeoMet] would have provided the convertible note," counsel for the Hall Defendants replied that there was "none that I'm aware of." To rebut this, GeoMet excerpts emails suggesting that negotiations for the convertible note requirement continued into the Fall of 2013. But these emails do not show that GeoMet was

willing to waive the backstop requirement (it was not), there is no evidence that GeoMet was able to provide AsiaSat with a convertible note, and therefore AsiaSat would not have triggered the loan process.

In sum, independent of anything the Hall Defendants did, GeoMet was unable to perform under the Cooperation Agreement. GeoMet was not able to obtain a sufficient backstop, and GeoMet was unable to provide AsiaSat with a convertible note. As a result, AsiaSat refused to undertake the loan process and GeoMet was unable to obtain the funds it needed. Consequently, GeoMet was unable to pay AWSF to build the STORM sensor.

GeoMet's first causation theory is rendered even more speculative by the timeline in this case. GeoMet's inability to perform the "key element" of the deal—on which AsiaSat's submission of the loan application for EXIM board approval was conditioned—led AsiaSat to take affirmative steps to delay and ultimately halt the loan approval process in July 2013,[14] nearly two months before Alan Hall was introduced to GeoMet on September 20, 2013.

---

likely to executive a convertible note, and they of course do nothing to dispute the fact that GeoMet *did not* execute a convertible note in favor of AsiaSat as required by the Cooperation Agreement. The Hall Defendants' motion for summary judgment contends only that GeoMet failed to satisfy this requirement, and this fact remains undisputed.

GeoMet further takes umbrage with defense counsel's assertion that GeoMet's aversion to the convertible note requirement stemmed from a fear of equity dilution. But the court can conceive of no reason why a dispute about GeoMet's *reason* for failing to execute the convertible note bears on this motion. It is undisputed that GeoMet's outside counsel viewed this requirement as "too onerous," and that Gene Pache suggested that GeoMet should move on from the AsiaSat deal, in part because of the difficulty of satisfying that term. Whether this view of the convertible note related to the repayment terms, the collateralization of STORM, or the terms on which the debt was convertible into equity would seem to matter not one bit.

[14] It is worth noting that Gene Pache's interpretation of AsiaSat's decision not to trigger the Federal Register filing—and consequently to halt submission of the loan to EXIM for the first board approval—was that it amounted to AsiaSat "telling [GeoMet] indirectly the deal is off." In response, AsiaSat, as it had consistently done, stressed the importance of GeoMet obtaining the backstops as contemplated by the relevant agreement: "The only outstanding thing being the guarantee, which is also the most sensitive one, we will proceed with the filing to the Federal Register as soon as we have more clarity on the guarantee."

Of course, there is a slim possibility that AsiaSat would have been willing to waive both requirements.[15] And perhaps AWSF would have been willing to continue building the STORM sensor, even after GeoMet defaulted on the STORM 001 Contract. But Utah law requires that GeoMet do more than "raise a conjecture or show a probability [as to causation]." *Mahmood*, 990 P.2d at 939 (citation omitted). GeoMet needed to show that it was more likely than not that the Hall Defendants prevented it from launching an AWSF-built STORM sensor on an AsiaSat satellite. *See id.* ("Where there are probabilities the other way equally or more potent the deductions are mere guesses and the jury should not be permitted to speculate."). GeoMet has failed to do so, and therefore its first damages theory fails as a matter of law because it would require the jury to speculate on causation. *See id.* ("[A jury may not] find a causal connection between a breach and some subsequent injury by relying on unsupported speculation.").

GeoMet's first damages theory is the most closely connected to the observable events that form the core of this dispute. In light of the court's finding that this theory fails because it involves multiple speculative contingencies, the remaining theories—each of which involve entities and occurrences that are even more attenuated from the actual course of events—face a decidedly uphill battle.

2. *GeoMet's Second Damages Theory*

GeoMet describes its second damages theory as follows:

---

[15] Some of GeoMet's causation theories rely on conjectural assertions that third parties might have excused GeoMet's breaches (material or otherwise), extended performance deadlines, or modified their contractual arrangements to accommodate GeoMet. Baseless suggestions that a party "might have waived" a contract requirement are wholly insufficient to rule out the consequent breach as a cause of lost profits. Accordingly, any causation theory that asserts, without evidence, that a counterparty might have abided GeoMet's breach, cannot be sustained. If any party could come to court in a contract case and successfully assert counterfactual scenarios involving the benevolence of counterparties in excusing non-performance, the law of contracts would be turned on its head.

> [GeoMet's] alternative measure of damages is the loss of the business opportunity as it was structured going into the Spring of 2014, under which [GeoMet] would use ITT to construct the Instrument, and would have pursued financing through [the] EXIM Bank either through balance sheet financing with AsiaSat as contemplated under the Cooperation Agreement with AsiaSat, or in the alternative would have obtained project financing and used a commercial satellite operator, such as JSAT, instead of AsiaSat.

This theory comprises two distinct theories. First, GeoMet lost profits because the Hall Defendants frustrated the EXIM Bank loan process, thereby preventing GeoMet from using the proceeds to pay ITT to build the STORM sensor. Second, GeoMet could have used project financing to obtain a loan (presumably from the EXIM Bank), used to the proceeds to pay ITT to build the STORM sensor, and used a commercial satellite operator, "such as JSAT," to launch the satellite. But there is no admissible evidence to support the plausibility, let alone the probability, of such a theory.

The first theory fails for the same reasons discussed above. GeoMet was unable to provide a sufficient backstop for the Proposed EXIM Loan, and GeoMet was unwilling to provide AsiaSat with a convertible note. Accordingly, AsiaSat was unwilling to undertake the loan process because it was concerned that it would "be on the hook to pay off the debt." In light of these undisputed facts, no reasonable jury could conclude that the Hall Defendants frustrated the EXIM Bank loan process, thereby preventing GeoMet from using the proceeds to pay ITT. In short, GeoMet, independent of anything the Hall Defendants did, was unable to satisfy the requirements of the Cooperation Agreement.

The second theory fails because it is entirely speculative that GeoMet would have been able to obtain project financing from the EXIM Bank, or any other bank for that matter. GeoMet asserts that "[the EXIM Bank] confirmed its ability to finance [GeoMet's] project through either balance-sheet or project financing, which confirmation was not limited to just having AsiaSat as

the operator to fly the sensor." In support of this, GeoMet cites an expert report from Jozsef Szamosfalvi, the former CFO of GeoMet. Mr. Szamosfalvi opines that the EXIM Bank "would likely have agreed to project financing." Mr. Szamosfalvi bases this opinion on his interactions with the EXIM Bank when he was the CFO of GeoMet and his experience financing other transactions with the EXIM Bank. But Mr. Szamosfalvi is unable to explain the terms on which the EXIM Bank would have offered project financing.

And Mr. Szamosfalvi's guess as to what the EXIM Bank might have done is unreliable because it is contradicted by the testimony of Christine Fogt, a representative of the EXIM Bank. When asked if GeoMet could "have applied for a loan under the project finance structure," her response was unequivocal: "No, because when we met, . . . the discussion was always focused to have [GeoMet] in partnership for this business proposal or the weather sensor to be a payload onto a satellite with AsiaSat. . . . This was not a special project set up with the understanding that repayment or evaluation repayment would only be strictly based on future revenues of [GeoMet's project] under a project finance deal. The repayment would be from an existing company with an established history and it was a corporate direct loan." Consequently, no reasonable juror could conclude that GeoMet could have obtained project financing from the EXIM Bank because GeoMet's sole basis for this argument is an expert report submitted by its former CFO that is based upon assumptions and opinions that are directly contrary to the undisputed facts.[16] *See Pioneer Ctrs. Holding Co. Emp. Stock Ownership Plan & Trust*, 858 F.3d at 1342.

---

[16] GeoMet experts Matthew O'Connell and Mark Piegza also base their opinions in part on the assumption that GeoMet could obtain project financing through EXIM bank (or some other unascertained lender). But there is insufficient evidence to support these assumptions. First, the testimony of third-party EXIM bank has affirmatively foreclosed any theory of financing GeoMet's venture that did not involve the balance sheet of a more established company (i.e.,

*3. The Third Damages Theory*

GeoMet describes its third damages theory as follows:

> Even with the elimination of [AWSF] and AsiaSat as business partners, with ITT and the three guarantees in hand, [GeoMet] would have pursued other satellite operators (including those previously identified by [GeoMet]), and pursued a modified agreement for EXIM Bank financing, through either balance sheet or "project financing."

This theory, like the first two, fails.

As discussed above, aside from Mr. Szamosfalvi's unsupported expert opinion, there is no evidence from which a reasonable juror could conclude that GeoMet could have obtained project financing from the EXIM Bank. The EXIM Bank did not consider this venture for project financing, and GeoMet has no evidence as to what the terms of such financing would have been. Consequently, no reasonable juror could conclude that GeoMet would have been able to obtain project financing.

**B. UNJUST ENRICHMENT DAMAGES THEORY**

Under its final damages theory, GeoMet seeks "unjust enrichment damages based on Defendants Hall's and Tempus's misappropriation of GeoMetWatch's trade secrets." GeoMet argues that it "is entitled to seek damages related to Tempus's increased value resulting from its possession and use of GeoMetWatch's information, even if Tempus is presently lying low." It is

---

AsiaSat). Second, aside from the *ipse dixit* of GeoMet's experts that GeoMet would have found another lender that would have extended a loan on terms that EXIM bank would not, there is no evidence to support this causation theory. The theory involving an entirely new lender is not merely unsupported by the evidence, it is directly controverted by the evidence. Mark Piegza and Matthew O'Connell each opine that firm revenue commitments are indispensable for a borrower seeking project financing. So even if it were not speculative that a hypothetical new lender would consider GeoMet for project financing, a reasonable jury could not find—without relying on speculation and conjecture—that but for the defendants, GeoMet would have obtained such firm commitments in the face of evidence that GeoMet only secured one such contract for $3.6 million per year. Indeed, Mark Piegza appears to acknowledge that the required minimum firm commitments would have been $35 million per year.

far from clear what this means, but a review of the report of GeoMet's damages expert seems to indicate that it seeks unjust enrichment damages as measured by "the value of the opportunity taken by the Defendants." GeoMet does not explain how "the value of the opportunity" differs from the remedy it seeks at law (i.e., lost profits damages), nor does it provide any legal authority for the proposition that unjust enrichment damages under the Utah Uniform Trade Secrets Act can be properly measured by anything but ill-gotten profits. And although there does not appear to be a Utah case on point, the general rule is that "[i]n cases of trade secret misappropriation, unjust enrichment is normally measured by the defendant's profits on sales attributable to the use of the trade secret." *Litton Sys., Inc. v. Ssangyong Cement Indus. Co., Ltd.*, 107 F.3d 30 (Fed. Cir. 1997) (finding the district court's "theory of unjust enrichment as encompassing unrealized expected gain [to be] unsupported in the law of unfair competition").

The Hall Defendants argue that GeoMet cannot recover under a theory of unjust enrichment because they have not been enriched. They state that Tempus, having ceased operations in June of 2016, "has never generated any revenue and never paid Alan Hall or Island Park any salary, dividend, distribution or compensation of any kind." They further state that "Mr. Hall has never received a salary, dividend or a distribution based on his ownership in or affiliation with Tempus."

GeoMet's does not to dispute these facts. Rather, it states only that "GeoMetWatch disputes any statement or inference that Tempus's failure to generate revenue forecloses GeoMetWatch's recovery of damages." But this statement is, at best, a non-responsive legal argument. As a result, the court must accept as undisputed the Hall Defendants' statements of material fact regarding their revenue and distributions. These facts establish that the Hall

Defendants were not enriched. Accordingly, they are entitled to summary judgment on any claim for recovery premised on a theory of unjust enrichment.

### C. CLAIMS SEEKING NOMINAL OR STATUTORY DAMAGES

The Hall Defendants also seek summary judgment on GeoMet's claims for nominal or statutory damages (i.e., the Lanham Act claim, the Truth in Advertising Act claim, and the Unfair Practices Act claim), arguing that GeoMet did not provide the damages calculations required by Rules 26 and 37 of the Federal Rules of Civil Procedure.

Rule 26(a)(1)(A) provides that a party must, without awaiting a discovery request, provide to the other party "a computation of each category of damages claimed by the disclosing party—who must also make available for inspection and copying under Rule 34 the documents or other evidentiary material, unless privileged or otherwise protected from disclosure, on which each computation is based, including materials bearing on the nature and extent of the injuries suffered." Rule 26(e) imposes an ongoing duty to supplement and correct disclosure made under Rule 26(a), and Rule 37(c)(1) provides for the exclusion of information not disclosed as required by Rules 26(a) and (e).

But the Hall Defendants do not cite, and the court has been unable to find, any authority suggesting that a party is precluded from seeking nominal or statutory damages for failing to include a "computation" of such damages in its initial disclosures.[17] While Rule 37 prohibits a party from using "information" on a motion if the party fails to provide the "information" as required by Rule 26(a) or (e), a request for nominal or statutory damages does not appear to

---

[17] The case the Hall Defendants cite for this proposition, *Sallenger v. City of Springfield*, No. 03-3093, 2008 WL 239139, at *1 (C.D. Ill. Jan. 28, 2008), held, without any reference to Rules 26 and 37, that the plaintiff's failure to request punitive damages in its complaint had deprived the defendant of notice that plaintiff was seeking punitive damages. But there has been no similar argument made here, and the court finds that the Third Amended Complaint was sufficient to apprise defendants that GeoMet was seeking nominal and statutory damages.

qualify as "information" that a party must disclose under Rule 26(a). Accordingly, the Hall Defendants motion for summary judgment on GeoMet's claims for nominal and statutory damages is denied.

## IV.    ORDER

For the reasons articulated, the Hall Defendants' Motion for Summary Judgment is **GRANTED IN PART and DENIED IN PART.**

IT IS ORDERED THAT:

1.  The Hall Defendants are entitled to summary judgment on GeoMet's claims for lost profits and unjust enrichment. GeoMet cannot recover these damages under any of its claims.

2.  The Hall Defendants are not entitled to summary judgment on GeoMet's claims for nominal and statutory damages.

3.  The following motions are denied as moot:

    a.  GeoMet's Motion to Exclude Defendants' Improper Expert Testimony. (ECF No. 626).

    b.  Defendants' Motion to Exclude Expert Testimony of Matthew O'Connell. (ECF No. 628).

    c.  Defendants' Motion to Exclude Expert Testimony Relating to the Four Lost Profits Scenarios. (ECF No. 632).

    d.  GeoMet's Motion to Exclude the Testimony of Troy D'Ambrosio. (ECF No. 636).

    e.  Defendants' Motion to Exclude Expert Testimony of Mark Piegza. (ECF No. 641).

f.  Defendants' Motion to Exclude Expert Testimony Relying on GMW's Revenue Models. (ECF No. 643).

g.  Defendants' Motion to Exclude Expert Testimony of Rick Hoffman. (ECF No. 648).

h.  Defendants' Motion to Exclude Expert Testimony of Joszef Szamosfalvi. (ECF No. 652).


Dated November 21, 2018

BY THE COURT

_____
Jill N. Parrish
United States District Court Judge