IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| GEOMETWATCH CORP., a Nevada corporation,<br><br>     *Plaintiff*,<br>v.<br><br>ALAN E. HALL, *et al.*,<br><br>     *Defendants*. | **MEMORANDUM DECISION AND ORDER GRANTING SUMMARY JUDGMENT TO TEMPUS GLOBAL DATA, INC.**<br><br>Case No. 1:14-cv-60<br><br>District Judge Jill N. Parrish |

This matter comes before the court on a motion for summary judgment filed by defendant Tempus Global Data, Inc. ("Tempus") on April 29, 2019. (ECF No. 860). Plaintiff GeoMetWatch Corporation ("GeoMet") responded in opposition on May 20, 2019 (ECF No. 883), and Tempus replied on June 10, 2019 (ECF No. 898). For the reasons below, Tempus's motion for summary judgment is granted.

## I.   BACKGROUND

This action followed the collapse of an incipient joint venture between GeoMet and Advanced Weather Systems Foundation ("AWSF") created for the purpose of constructing and deploying a satellite-hosted weather sensor system and commercially exploiting the data derived therefrom. The operative complaint alleges that Tempus, and associated individuals and entities, colluded with AWSF and others to deprive GeoMet of the business opportunity it had developed.[1]

---

[1] The factual background of this case is described more extensively in the court's November 27, 2018 Memorandum Decision and Order at ECF No. 811.

On November 27, 2018, this court issued a memorandum decision and order (the "Damages Order") granting partial summary judgment to Tempus on grounds that GeoMet's damages theories were impermissibly speculative. (ECF No. 811). But the operative complaint also asserted three claims unaffected by the Damages Order under which GeoMet sought only nominal or statutory damages: a Utah Truth in Advertising Act claim, a Utah Unfair Practices Act claim, and a federal false advertising claim under the Lanham Act. Tempus now seeks summary judgment on those claims.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the initial burden of demonstrating the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant has met this burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (citation omitted). To do so, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

When the nonmoving party bears the burden of proof at trial on a dispositive issue, that party must "go beyond the pleadings" and designate specific facts so as to "make a showing sufficient to establish the existence of an essential element to that party's case." *Celotex*, 477 U.S. at 322. "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Liberty Lobby, Inc.*, 477 U.S. at 249. On summary judgment, "courts are required to view the facts and draw reasonable

inferences" in the light most favorable to the non-movant. *Scott v. Harris*, 550 U.S. 372, 378 (2007).

## III. ANALYSIS

GeoMet does not oppose summary judgment on its Utah Truth in Advertising Act and Utah Unfair Practices Act claims. Thus, Tempus is entitled to summary judgment on those state law claims. That leaves for resolution only Tempus's motion for summary judgment on GeoMet's Lanham Act claim.

To prevail on a Lanham Act false advertising claim, GeoMet must prove:

> (1) that [Tempus] made material false or misleading representations of fact in connection with the commercial advertising or promotion of its product; (2) in commerce; (3) that are either likely to cause confusion or mistake as to (a) origin, association or approval of the product with or by another, or (b) the characteristics of the goods or services; and (4) injure the plaintiff.

*Digital Ally, Inc. v. Util. Assocs., Inc.*, 882 F.3d 974, 978 (10th Cir. 2018); *see* 15 U.S.C. § 1125(a). Tempus asserts that GeoMet cannot adduce evidence to establish the first, third, and fourth elements. In response, GeoMet points to several emails, a website screenshot, and the deposition testimony of Dr. David Crain—an owner and founder of GeoMet—to argue that factual disputes preclude summary judgment. The court considers each alleged false statement below.[2]

### A. THE JANUARY 14, 2014 EMAIL

On January 14, 2014, in response to a query from a business development representative of a prominent American defense contractor about whether Tempus would be "assum[ing] the role of [GeoMet]" in the STORM project, Alan Hall (an owner of Tempus) stated that "yes we

---

[2] Some of the exhibits on which GeoMet relies to support its Lanham Act claim were filed under seal. The court's analysis of those documents omits sensitive details, but only insofar as doing so does not materially impair the court's ability to explain its reasoning.

are replacing the roles and duties of [GeoMet]. We will own and manage the relationships of all entities in the consortium. We will pay for and own the sensors and the data generated from them. We are building a business that will sell said data products on a globally [sic] basis." Mr. Hall's response was directed to the business development executive, with copies sent to representatives of AWSF—the putative manufacturer of the proposed sensor.

As an initial matter, it is far from clear whether this statement to a single individual at a defense contractor qualifies as "commercial advertising or promotion" under the Lanham Act. As the Tenth Circuit holds:

> In order for representations to constitute "commercial advertising or promotion" under Section 43(a)(1)(B), they must be: (1) commercial speech; (2) by a defendant who is in commercial competition with plaintiff; (3) for the purpose of influencing consumers to buy defendant's goods or services. While the representations need not be made in a "classical advertising campaign," but may consist instead of more informal types of "promotion," the representations (4) must be disseminated sufficiently to the relevant purchasing public to constitute "advertising" or "promotion" within that industry.

*Proctor & Gamble Co. v. Haugen*, 222 F.3d 1262, 1273–74 (10th Cir. 2000) (quoting *Gordon & Breach Science Publishers, S.A. v. Am. Inst. of Physics*, 859 F. Supp. 1521, 1535–36 (S.D.N.Y. 1994)). The parties provide no context about the defense contractor's potential role in STORM, nor do they indicate how many other entities could perform that role. As a result, the court is without the facts necessary to determine whether statements in this single email to a single individual were "disseminated sufficiently to the relevant purchasing public to constitute 'advertising' or 'promotion' within" this industry. *See id.* at 1274.

But even if the email meets each component of the above standard, the court cannot find that Mr. Hall's statement was false or misleading for at least two reasons. First, with the arguable exception of the statement "we are replacing the roles and duties of [GeoMet]," the statements are all clearly forward-looking: "We *will* own and manage the relationships of all entities in the

consortium. We *will* pay for and own the sensors and the data generated from them. We are building a business that *will* sell said data products on a globally [sic] basis." (emphasis added). These remarks evince a plan to achieve these objectives, and having spent considerable time in the voluminous record in this case, the court is confident that Tempus indeed intended to accomplish them. Thus, these statements were not literally false. And in light of their recipient, the statements cannot be said to be misleading. A business development executive at a multi-billion-dollar defense contractor would not interpret these statements of future intent as "representations of fact." In sum, Hall's forward-looking statements cannot serve as predicates for a Lanham Act claim.

Hall's statement that "we are replacing the roles and duties of [GeoMet]" was also neither false nor misleading. The use of "are" indicates that the replacement was ongoing, and when this statement was made, AWSF and Tempus had already begun replacing GeoMet with Tempus. Indeed, this statement was made more than 45 days after AsiaSat declined to extend the time by which GeoMet was required to have performed its obligation to obtain adequate financial guarantees before AsiaSat formally applied for an ExIm loan, and a week after AWSF asserted that GeoMet had materially breached the build agreements by failing to make a $5 million payment to begin construction of the first sensor. By January 14, 2014, AWSF, AsiaSat, and GeoMet would all have believed that GeoMet had no immediately apparent route to funding its venture,[3] and thus, no way to cure its material breach. AWSF and Tempus were actively preparing for Tempus to step into GeoMet's shoes in the wake of GeoMet's inevitable failure to cure. Because Hall's statements accurately conveyed the status of the pending joint venture, the January 14, 2014 email cannot form the basis of a Lanham Act claim.

---

[3] In fact, as early as December 3, 2013, GeoMet and AsiaSat clearly regarded their joint ExIm loan application as defunct. (ECF No. 908-10 at 2).

### B. THE FEBRUARY 7, 2014 EMAIL

Next, GeoMet points to an email sent by Hall on February 7, 2014 to Tempus and AWSF employees, expressing that he "need[s] to put the last nail in [GeoMet's] coffin." "To this end," Hall wrote, "it makes sense to tell them now that they have lost the license, verbally and in writing." GeoMet argues that this email referred to a "public campaign to 'put the last nail' in [GeoMet's] coffin," (ECF No. 883 at 4), but these statements are incapable of generating any reasonable inferences that the email referred to actual or contemplated public statements. Even if GeoMet is correct that the email referred to a public campaign, GeoMet has adduced no evidence that such a campaign ever materialized.

Moreover, GeoMet does not explain how these statements are false (or even that they are falsifiable), and because they were disseminated only to Tempus's co-venturers, the statements do not constitute "commercial advertising or promotion."

### C. THE JANUARY 28, 2014 EMAIL

GeoMet next points to an email conversation among AWSF-related individuals discussing the Tempus/AWSF venture's public relations strategy in advance of GeoMet's imminent failure to cure its material breach. But it contains no false or misleading statements, and was transmitted only to co-venturers.

### D. THE MARCH 13, 2014 EMAIL

The March 13, 2014 email was sent by Tempus employee Mark Hurst to various AWSF-associated individuals directing one employee to draft a press release "highlighting"—among other things—that Tempus has "replaced the lapsed contract of [GeoMet]." In its January 12, 2019 order granting summary judgment in favor of AWSF, the court found that this email could not support a Lanham Act claim because there was no evidence that a press release ever issued, and that even if there were, the statements were false or misleading. The court reasoned:

6

> GeoMet's contract with AWSF was in fact terminated in February of 2014 after GeoMet failed to cure its material breach of the PPA—a breach precipitated by GeoMet's failure to meet the milestone payment schedule under the STORM 001 contract. Indeed, by all indications, by March of 2014, Tempus had assumed GeoMet's role in the AWSF partnership. In fact, GeoMet itself issued a press release that same month announcing, in effect, that GeoMet had replaced AWSF with Exelis as its sensor manufacturer.

(ECF No. 828 at 5). The court's conclusions are unaffected by any evidence or arguments contained in the instant motion, and thus, these statements remain insufficient to support a Lanham Act claim.

### E. TEMPUS'S WEBSITE

GeoMet next sets forth an April 2014 screenshot of Tempus's website, which captured Tempus's representations that it:

> [D]esigns, manufactures and operates environmental and weather monitoring instruments, known as STORM . . . on a global scale. . . . From our sensors we gather the most sophisticated weather data ever produced and sell it to sovereign governments and commercial entities." GeoMet asserts that in April of 2014, Tempus "had no means of gathering, producing, [or] selling weather data.

The representation that Tempus presently manufactures and operates STORM, and gathers and sells the data therefrom was apparently literally false in April of 2014. In fact, Tempus apparently never launched a single sensor. But the Lanham Act does not transform every false statement made by a commercial entity into a cause of action for the benefit of its competitor. Rather, the Act makes actionable only those false or misleading statements that cause confusion amongst the relevant purchasing public.

Although GeoMet adduces proof that, in late 2013 through early 2014, some individuals in the aerospace defense contractor space were confused about whether GeoMet or Tempus would be partnering with AWSF to construct and launch STORM, this confusion is wholly disconnected from Tempus's false statement that, in April of 2014, Tempus had the ability to gather and sell weather data derived from an operational STORM sensor. GeoMet is without

even a scintilla of evidence that any member of the relevant purchasing public was confused about whether Tempus had, in fact, constructed a STORM sensor, launched that sensor on a third-party satellite, and was actively gathering and selling STORM-derived data. For all these reasons, Tempus's false statement on its website does not give rise to Lanham Act liability.

F. LICENSE REPRESENTATION

GeoMet next argues that, as early as April 1, 2014, Tempus falsely represented that it "was licensed by the U.S. Government to operate a global, commercial, geostationary hyperspectral imaging/sounding system." If this statement were actually made in April of 2014, it would appear to be clearly false, as Tempus did not procure a NOAA license until July of that same year. As evidentiary support, however, GeoMet merely cites to an unsupported allegation in its original—now superseded—complaint. And as the party that bears the burden of proof at trial, GeoMet must "go beyond the pleadings" and designate specific facts so as to "make a showing sufficient to establish the existence of" this statement. *Celotex*, 477 U.S. at 322. GeoMet has not adduced facts sufficient to establish that Tempus stated that it possessed a NOAA license before it did, and thus, this alleged statement cannot form the basis of GeoMet's Lanham Act claim.

G. HALL'S STATEMENTS THAT TEMPUS WAS "GEOMETWATCH 2.0"

Finally, GeoMet relies on Dr. Crain's deposition testimony to establish statements made by Alan Hall that Tempus was "GeoMetWatch 2.0." Dr. Crain testified that he himself never heard Hall make this statement. Instead he was told by GeoMet's congressional lobbyist about the statement, who in turn was told by a United States Congressman that Hall had told him that Tempus was "GeoMetWatch 2.0." Because he did not personally perceive Hall making this statement, he is not qualified to testify that Hall made it. *See* Fed. R. Evid. 602 advisory committee's notes on proposed rules ("[A] witness who testifies to a fact which can be perceived

by the senses must have had an opportunity to observe, and must have actually observed the fact . . . .").

But even if Dr. Crain's testimony is both admissible and sufficient to establish the existence of those statements, this statement cannot support a Lanham Act claim for two reasons. First, the Lanham Act makes actionable only false or misleading representations of *fact*. Surely GeoMet does not contend that Alan Hall was conveying, or that a United States Congressman would believe, that Tempus was literally "GeoMetWatch 2.0." Rather, any reasonable person—and certainly any reasonable member of the defense, satellite, or meteorological industries—would interpret this statement to mean that Tempus was a newer, better version of GeoMetWatch. In other words, this statement was mere puffery, "considered to be offered and understood as an expression of the seller's opinion only, which is to be discounted as such by the buyer." *See Intermountain Stroke Center, Inc. v. Intermountain Health Care, Inc.*, 638 F. App'x 778, 787 (10th Cir. 2016) (quoting *Castrol Inc. v. Pennzoil Co.*, 987 F.2d 939, 945 (3d Cir. 1993)).

GeoMet suggests that this statement necessarily (and falsely) "implied that [GeoMet] was out of the venture or unable to compete in the venture." The court disagrees. Nothing in Hall's characterization of Tempus as "GeoMetWatch 2.0" *necessarily* implied that GeoMet was unable to compete in the venture and, by February 7, 2014 at the very latest, GeoMet was, in fact, "out of the venture." And even if characterizing Tempus as "GeoMetWatch 2.0" necessarily implied that GeoMet was "unable to compete in the venture," that implication is likely to have been expressed and received as mere puffery. Stated simply, a Lanham Act false advertising claim does not lie every time a commercial actor suggests its competitor is "unable to compete."

As explained above, to meet its burden of demonstrating confusion arising from false statements, GeoMet points to emails that evince confusion arising from the substitution of Tempus for GeoMet in the STORM project, an event that actually transpired.[4] But GeoMet has absolutely no evidence that this confusion was caused by Hall's statement to a United States Congressman that Tempus was "GeoMetWatch 2.0."

For all these reasons, the alleged statement that Alan Hall referred to Tempus as "GeoMetWatch 2.0" cannot support GeoMet's Lanham Act claim.

## IV. ORDER

For the reasons articulated, Tempus's motion for summary judgment (ECF No. 860) is **GRANTED.** Tempus is entitled to summary judgment on GeoMet's Utah Truth in Advertising Act claim, its Utah Unfair Practices Act claim, and its federal Lanham Act claim.

Signed August 2, 2019

BY THE COURT

_____
Jill N. Parrish
United States District Court Judge

---

[4] GeoMet argues that Tempus's collective statements caused confusion among GeoMet's investors, but Dr. Crain's testimony establishes that GeoMet's investors were merely confused about why GeoMet had been replaced by AWSF. (ECF No. 884-4 at 11–12).