## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| GEOMETWATCH CORP., a Nevada corporation, <br><br>       *Plaintiff*, <br> v. <br><br> ALAN E. HALL, *et al.*, <br><br>       *Defendants*. | **MEMORANDUM DECISION AND ORDER RE CROSS-MOTIONS FOR SUMMARY JUDGMENT** <br><br> Case No. 1:14-cv-00060-JNP <br><br> District Judge Jill N. Parrish |

This matter comes before the court on cross-motions for summary judgment on a breach of contract counterclaim asserted by counterclaim-plaintiff Advanced Weather Systems Foundation ("AWSF") against counterclaim-defendant GeoMetWatch Corp. ("GeoMet"). On the basis of the memoranda in support of those motions (ECF Nos. 870 & 876), the responses thereto (ECF Nos. 904 & 909), the ensuing replies (ECF Nos. 930 & 931), a review of relevant law, and for the reasons below, each motion for summary judgment is granted in part and denied in part.

## I.  BACKGROUND

This counterclaim emanates from a multi-defendant lawsuit involving a fledgling satellite-hosted weather sensor venture. In that suit, plaintiff GeoMet asserts that AWSF—an entity created for the purpose of designing and manufacturing the weather sensors—colluded with others to deprive GeoMet of the business opportunity it had developed.[1] In response, AWSF

---

[1] For a complete account of the actors, events, and timeline giving rise to the original lawsuit, see the November 27, 2018 Amended Memorandum Decision and Order Granting in Part and Denying in Part Motion for Summary Judgment (the "November Order") at ECF No. 811.

asserts a breach of contract counterclaim against GeoMet. The parties each seek summary judgment on that counterclaim.

**A. STATEMENT OF FACTS**

**1. GeoMet and AWSF Enter into Three Agreements**

On September 19, 2013, GeoMet and AWSF entered into a Preferred Provider Agreement (the "PPA"). Despite having been executed in September, the PPA's effective date is April 19, 2013. In addition to several proscriptive provisions, the PPA requires that GeoMet "enter into, maintain, and fulfill . . . the October 1, 2013 [STORM[2] 001 contract]," and that "[m]aintenance of the . . . contract specifically includes complying with the payment schedule set forth [in the STORM 001 contract]." The PPA grants AWSF the right to terminate that agreement by giving written notice of material breach to GeoMet if, among other things, GeoMet fails to comply with the payment schedule set forth in the STORM 001 contract. The PPA's termination would be effective thirty days after AWSF provided written notice unless GeoMet cured the material breach.

On October 4, 2013, GeoMet and AWSF executed the STORM 001 contract—"for the design, manufacture, test and calibration" of the sensor system—as contemplated by the PPA. On the same day, GeoMet and AWSF executed the STORM 002 contract, for "Field Support" of the sensor system. Under both contracts (collectively the "Build Agreements"), GeoMet was obligated to "ensure adequate funding to comply" with the payment schedules prescribed in the respective agreements. Under each of the Build Agreements, GeoMet's failure to make any of the milestone payments amounts to an "Event of Default," entitling AWSF to immediately cease performance and terminate the Build Agreements.

---

[2] STORM refers to the sensor system, an acronym for Sounding and Tracking Observatory for Regional Meteorology.

Under the STORM 001 payment schedule, GeoMet was required to pay AWSF a total of $124,933,872, with the first payment of $5,384,022 coming due on January 6, 2014. Under the STORM 002 payment schedule, GeoMet was required to pay AWSF a total in excess of $25 million, with the first payment coming due on February 4, 2014.

The PPA and the Build Agreements contain: (1) choice-of-law provisions declaring that the agreements are "governed by" Utah law; (2) integration clauses; and (3) provisions withholding effect from any purported contractual supplement or modification not embodied by a writing signed by both GeoMet and AWSF.

## 2. Precontractual Negotiations and Expenditures

AWSF and GeoMet began negotiating the relevant agreements as early as February of 2013, which process continued into October of the same year. On September 3, 2013, GeoMet sent an inquiry to AWSF, asking whether, under the current drafts of the Build Agreements, it was correct that, "if for some reason we are not able to make the payment schedule, we will prepare and execute a contract mod rather than enforce or highlight the 'material contracts breach' language." AWSF responded that "[i]f funding does not come in time, we will be required to modify the contract. It would not be our intent to assert 'breach', but we could only take that position for a limited period of time (certainly not indefinitely)."

Gene Pache–one of GeoMet's founders and owners—testified that, on October 4, 2013, he told AWSF that he would sign the Build Agreements "under one condition[:] you [AWSF] agree to amend this to say that this contract depends on the ExIm loan and that without the ExIm loan this is basically null and void." Mr. Pache testified that he asked AWSF if it "will amend the contract to say that it's dependent on the ExIm loan," and he further testified that AWSF responded, "yes." Mr. Pache testified that he signed the Build Agreements only after AWSF agreed to amend them the following day.

From March to October of 2013, AWSF incurred expenses totaling $1,979,769.11 to satisfy "salaries, staff benefits, various operating expenses including telephone, IT, computer charges, office supplies, and other equipment necessary to AWSF's operations."

### 3. AsiaSat and the ExIm Loan

To fund the construction and launch of the first STORM sensor, GeoMet intended to secure a loan through the Export-Import ("ExIm") Bank of the United States. The ExIm bank originates loans to foreign entities to finance the purchase of goods exported from the United States. Accordingly, GeoMet entered into a cooperation agreement with AsiaSat—a Hong Kong-based commercial satellite company that had planned to host the first STORM sensor on one of its satellites—whereby AsiaSat would undertake to procure a $125 million loan from the ExIm bank, the proceeds of which would be used by GeoMet to, among other things, pay AWSF to design and construct the STORM sensor.

Before AsiaSat had any obligation to submit its application for the ExIm loan, GeoMet was required to have secured financial guarantees acceptable to AsiaSat to reduce its default exposure under the proposed ExIm loan. GeoMet was unable to procure sufficient financial guarantees, and despite two extensions of GeoMet's time to obtain them, on December 3, 2013, AsiaSat wrote GeoMet to inform it that, because "the necessary guarantees" had not been obtained, it did not intend to further extend GeoMet's time to perform. Mr. Pache responded to thank AsiaSat for its cooperation, remarking that "[i]t is an awful ending. . . . I am so sorry we could not make it work."

In January of 2014, GeoMet renewed discussions with AsiaSat, but the parties never extended GeoMet's time to perform the conditions precedent under the cooperation agreement.

### 4. GeoMet Breaches the STORM 001 Agreement, Thereby Materially Breaching the PPA

Three days after being informed that AsiaSat would not renew its ExIm loan cooperation agreement, GeoMet received an invoice from AWSF for the first STORM 001 milestone payment in the amount of $5,384,022. GeoMet did not seek a modification to extend the payment deadline at that time. On January 3, 2014, GeoMet wrote AWSF to explain that it was attempting to gather funds that would enable AWSF to maintain a "skeleton crew . . . in order to buy more time so-to-speak." GeoMet's email made no reference to any potential funding to facilitate its compliance with the milestone payment schedule, and it made no request to execute a contract modification extending the first payment.

On January 6, 2014, GeoMet failed to make the first milestone payment of $5,384,022 as required by the STORM 001 agreement. The next day, AWSF notified GeoMet that its failure to make the $5,384,022 payment constituted (1) an Event of Default under the STORM 001 Contract and (2) a material breach of the PPA. Consequently, AWSF notified GeoMet that it was (1) terminating the STORM 001 Contract and discontinuing performance under the contract and (2) terminating the PPA on the condition that GeoMet did not cure the breach within thirty days. On February 4, 2014, GeoMet failed to make the STORM 002's first payment.

In a January 28, 2014 email, Mr. Pache asked a representative of AWSF's parent organization, Utah State University, to "back [him] on" his recollection of representations made before he signed the STORM 001 agreement in October of 2013. Mr. Pache recounted that at the signing, he was concerned that ExIm funding would not close by January 1, 2014, but that AWSF and GeoMet's Chief Development Officer told Mr. Pache not to worry—that the contract would be extended "to coincide with the ExIm loan." Mr. Pache represented that he "signed the contract based on [AWSF's] verbal commitment to extend the contract as necessary."

On February 6, 2014—the final day of the PPA's 30-day cure period—GeoMet wrote AWSF requesting (1) either a 60-day or an "open-ended" extension to the STORM 001 milestone payment schedule; and (2) to "mutually extend" the PPA. In support of these requests, GeoMet outlined "some of the milestones that [GeoMet] has achieved that demonstrate [its] intentions to complete a successful GeoMetWatch/STORM program." GeoMet further asserted that AWSF and GeoMet "have collectively agreed on many occasions that extensions may be necessary in order to accommodate the difficulty associated with starting this contract and generating funds through the ExIm bank loan process." Although the letter indicated that GeoMet was still communicating with AsiaSat about obtaining the financial guarantees necessary to submit the ExIm loan application, it made no representations about the likelihood or timeline of securing the funding necessary to meet the milestone payments required by the STORM 001 agreement.

On February 10, 2014, AWSF responded, explaining that it could not "accept the milestone achievements outlined in your letter as a cure that would justify the extension of the . . . 'STORM 001' [contract] or the . . . [PPA]." AWSF further explained that "[t]he timelines, projections, and goals outlined in your letter, though admirable, do not provide adequate assurances that [GeoMet] will be in a position to meet the immediate needs of AWSF and our employees from a funding perspective." The letter further informed GeoMet that the STORM 001 contract was terminated as of January 7, 2014 (the day after GeoMet failed to make that contract's first milestone payment), the STORM 002 contract was terminated as of February 5, 2014 (the day after GeoMet failed to make that contract's first milestone payment), and that the PPA was terminated as of February 6, 2014 (thirty days after AWSF asserted material breach).

## II.    ANALYSIS

GeoMet seeks summary judgment on three grounds: (1) that the bulk of AWSF's damages were incurred before any agreement was executed and that AWSF's post-contractual damages are fully offset by "bridge" payments made by GeoMet in the fall of 2013; (2) that the agreements were fraudulently induced and are therefore voidable at GeoMet's election; and (3) that AWSF's damages are consequential damages barred by the agreements. AWSF's motion presents the flip-side of GeoMet's arguments, and further asserts: (1) that GeoMet's affirmative "first breach" defense fails as a matter of law; and (2) that the summary judgment record is sufficient to grant summary judgment in favor of AWSF and to award AWSF $1,979,796.11 in actual, compensatory damages as a matter of law.

The court analyzes each argument in turn.

### A. GEOMET'S FRAUDULENT INDUCEMENT DEFENSE

GeoMet asserts three representations allegedly made by AWSF as the bases of its fraudulent inducement defense: (1) AWSF's statement that "[i]f funding does not come in time, we will be required to modify the contract. It would not be our intent to assert 'breach', but we could only take that position for a limited period of time (certainly not indefinitely)"; (2) AWSF's "verbal commitment to extend the contract as necessary;" and (3) AWSF's representation that it would formally amend the Build Agreements to condition the parties' obligations to perform on the consummation of an ExIm loan.[3]

---

[3] The allegation that AWSF fraudulently promised that if Mr. Pache would sign the Build Agreements, AWSF would formally amend them to condition all of GeoMet's obligation on the occurrence of ExIm loan funding is supported only by Mr. Pache's deposition testimony. Mr. Pache offered a contradictory version of events in contemporaneous email communications to AWSF (that AWSF had *verbally* promised to extend the contract if ExIm funding did not close in time to make the STORM 001 contract's first milestone payment). Because the jury could credit either account, the court will analyze both representations under the fraudulent inducement framework.

The parties disagree over the legal standard applicable to GeoMet's fraudulent inducement affirmative defense. AWSF argues that GeoMet must establish the elements of a fraudulent inducement *claim* in order to excuse its failure to make the milestone payments, which claim requires its proponent to establish:

> (1) that a representation was made (2) concerning a presently existing material fact (3) which was false and (4) which the representor either (a) knew to be false or (b) made recklessly, knowing that there was insufficient knowledge upon which to base such a representation, (5) for the purpose of inducing the other party to act upon it and (6) that the other party, acting reasonably and in ignorance of its falsity, (7) did in fact rely upon it (8) and was thereby induced to act (9) to that party's injury and damage.

*Keith v. Mountain Resorts Dev., L.L.C.*, 337 P.3d 213, 225–26 (Utah 2014).

By contrast, GeoMet asserts that it need only establish the following four-prong test used to determine whether a contract is voidable on the basis of a misrepresentation: "[F]irst, there must be a misrepresentation, second, 'the misrepresentation must have been either fraudulent or material,' third, 'the misrepresentation must have induced the recipient to make the contract,' and, fourth, 'the recipient must have been justified in relying on the misrepresentation.' *Miller v. Celebration Mining Co.*, 29 P.3d 1231, 1235 (Utah 2001) (citations omitted) (quoting Restatement (Second) of Contracts § 164(a), cmt. a (Am. Law Inst. 1981)).

The court need not resolve this dispute because, as explained below, none of the statements GeoMet relies upon for its fraudulent inducement defense satisfy either standard.

### 1. AWSF's Representation Regarding Its Intent Not to Assert Breach

GeoMet first sets forth AWSF's statement that "[i]f funding does not come in time, we will be required to modify the contract. It would not be our intent to assert 'breach', but we could only take that position for a limited period of time (certainly not indefinitely)." This statement fails to support a fraudulent inducement defense for at least three reasons.

First, GeoMet provides no evidence to prove that this statement was a misrepresentation. The Utah Supreme Court holds that promises of future performance can qualify as false representations of "presently existing material facts" only when they are "made with a present intent not to perform." *Von Hake v. Thomas*, 705 P.2d 766, 770 (Utah 1985). Thus, at trial, GeoMet would bear the burden of proving that at the time AWSF expressed that "[i]t would not be [its] intent to assert 'breach,'" it, in fact, intended that it would assert breach.

The summary judgment record is devoid of even circumstantial evidence that AWSF made this statement with a present intent not to abide by it. Indeed, GeoMet's own theory is inconsistent with the statement having been made with a present intent not to perform accordingly. GeoMet asserts that AWSF conspired with the Hall Defendants to cause GeoMet to breach its agreements with AWSF so that AWSF could terminate those agreements and permissibly enter into substantially similar contracts with another entity. But if AWSF's goal were to be free of contractual obligations vis-à-vis GeoMet, it is entirely unclear how inducing GeoMet to execute the Build Agreements would have furthered this aim. It defies plausibility that AWSF wanted to execute enforceable Build Agreements while simultaneously intending to lure GeoMet into materially breaching those agreements three months later in order to terminate them and contract with another entity. Clearly, AWSF could have achieved that aim—if it existed at the time of contracting—by declining to execute the agreements in the first place. In sum, GeoMet has not set forth sufficient evidence to empower a jury to find that AWSF made the statement about a contract modification extending GeoMet's time to perform with a present intent not to perform. Thus, with respect to this statement, GeoMet has not established the existence of a misrepresentation.

Second, GeoMet's reliance on this representation was simply not reasonable (or, under GeoMet's proposed standard, its reliance on the representation was not justified). From February until October of 2013, GeoMet and AWSF—sophisticated corporate actors comprised of experienced professionals—negotiated the terms of a series of agreements that obliged the parties to exchange more than $100 million of payments and services over the course of several years.

The summary judgment record reveals that the parties carefully negotiated even minor details of the integrated Build Agreements. This degree of concern in the negotiations is unsurprising; sophisticated business parties care a great deal about the terms of the agreements that will bind them, and they know well how important it is that their integrated contracts fully and accurately reflect their agreement. GeoMet's argument that it reasonably relied on promises not contained in the Build Agreements flies in the face of record evidence establishing that the parties pored over drafts of those agreements, with each party successfully bargaining for the inclusion of specific language to define the contours of their obligations. They ultimately entered into the Build Agreements on October 4, 2013, which agreements contained integration clauses, and further required any modifications thereof to be embodied by a signed writing.

In Utah, "sophisticated business parties are charged with knowledge of the terms of the contracts that they enter into." *ASC Utah, Inc. v. Wolf Mountain Resorts, L.C.*, 245 P.3d 184, 193 (Utah 2010). In light of these straightforward contract terms, and the sophistication of the parties, it was simply unreasonable for GeoMet to rely on AWSF's statement. A reasonably prudent business party would have realized that by operation of contract, it could not reasonably rely on a promise not appearing in that contract. The reasonable response to AWSF's representation would have been to request that such a provision be inserted into the agreement, thereby obviating the

need to rely on the uncertain—and in any event not contractually required—prospect of subsequent contract modification. The clear inference is that GeoMet did not possess sufficient bargaining power to secure a provision automatically extending the first milestone payment if ExIm funding did not close by January 6, 2014. It cannot now use the defense of fraudulent inducement to avoid the ramifications of the deal it struck.

Moreover, AWSF's representation—that an extension would need to be made by contract modification and that "it would not be our intent to assert breach"—hardly inspires confidence in the firmness of that proposition. So even if GeoMet justifiably relied on extracontractual representations, it is far from clear that GeoMet would be justified in relying on this representation to conclude that the milestone payment deadline would be extended. A reasonably prudent recipient of this statement—compared to a party *hoping* that the statement of future intent will come to fruition—would scarcely feel safe that its interests would be protected on the basis of this representation alone. In sum, no reasonable jury could find that GeoMet's reliance on AWSF's representation that "it would not be our intent to assert breach" was reasonable.

And finally, GeoMet has no evidence to show that AWSF's failure to abide by its extracontractual representation that it would not be its intent to assert breach "for a limited period of time (certainly not indefinitely)," caused it to breach the agreement. Stated differently, if AWSF had declined to avail itself of its bargained-for rights under the integrated Build Agreements, instead waiting for a "limited period of time" to assert breach, GeoMet has no evidence to show that it could have secured more than $5 million in funding before "a limited period of time" had elapsed. Indeed, GeoMet's only identifiable route to securing the substantial sums required to comply with the milestone payment schedule—the ExIm loan—had lain

dormant since November 31, 2013, when AsiaSat's obligation to apply for ExIm funding lapsed as a result of GeoMet's repeated failure to perform the conditions precedent to AsiaSat's duty.

After receiving the first invoice of $5,384,022 in early December, GeoMet made no attempt to invoke the contractual modification it claims was promised by AWSF, an understandable response in light of the collapse of the ExIm loan in the days prior. In February, more than a month after the first milestone payment was due, GeoMet sought either a 60-day or "open-ended" extension of the Build Agreements' payment schedules. Of course, AWSF's representation expressly foreclosed any "open-ended" extension ("we could only take that position for a limited period of time (certainly not indefinitely)"). And GeoMet made no representations in its letter to cause AWSF to believe that a 60-day extension would have been sufficient for GeoMet to secure funding. Even now, GeoMet has no evidence that an extension would have enabled it to resuscitate, and subsequently consummate, the ExIm loan process that AsiaSat had effectively abandoned in early December of 2013.[4] Thus, even if some enforceable content could be assigned to the promise to extend the payment schedules "for a limited period of time" such that its veracity could be tested, GeoMet has no evidence to show that it would have obtained more than $5 million during the "limited" extension period.[5] Indeed, during January, GeoMet was attempting to gather much more limited funding to permit AWSF to

---

[4] For a more fulsome discussion of the complex, time-consuming ExIm loan application process for loans exceeding $100 million, as well as the nature of guarantees required by AsiaSat that had eluded GeoMet and caused AsiaSat to decline to file the ExIm loan application, see the November Order at ECF No. 811.

[5] Additionally, AWSF's representation came in response to GeoMet's inquiry about the prospect of executing a contract modification extending the first milestone payment "if for some reason our partner institutions are later than we anticipate in funding *due to items or delays beyond our collective control*." (emphasis added). But the failure of the ExIm loan application to be submitted was caused by *GeoMet*'s failure to perform the conditions precedent to AsiaSat's obligation to submit the application—*viz.*, sufficient financial guarantees and the execution of a convertible note in AsiaSat's favor.

maintain a "skeleton" crew while GeoMet continued to seek funding to comply with the Build Agreements.

### 2. GeoMet's "Verbal Commitment to Extend the Contract as Necessary"

For substantially the same reasons that no reasonable jury could find GeoMet's reliance on AWSF's first statement to be justified or reasonable, no reasonable jury could find GeoMet's reliance on AWSF's alleged verbal representation that it would "extend the contract as necessary" to be reasonable or justified.

### 3. AWSF's Promise to Amend the Build Agreements after Mr. Pache Executed Them

Finally, GeoMet alleges that AWSF promised Mr. Pache that if he would sign the Build Agreements, AWSF would formally amend them the following day to condition their validity on the availability of ExIm funding. As with the first two statements, a consideration of the factual setting in which this representation is alleged to have occurred alongside the sheer magnitude of the alleged promise reveals that no reasonable jury could find GeoMet's reliance on the statement to be reasonable.

GeoMet contends that AWSF agreed to condition both Build Agreements—amounting to GeoMet's obligation to make more than $100 million in payments—on the uncertain success of a single method of funding. Securing such a term would have constituted a massive realignment of the parties' relative risk,[6] and in light of the substantial importance of such a provision to GeoMet, it is unreasonable for Mr. Pache to have signed documents *not* containing that promise. Rather, in the face of this alleged representation, Mr. Pache had a duty to insist that the term be entered prior to signing. As the Utah Supreme Court has explained:

---

[6] Indeed, AWSF would have in substance assumed *all* the risk that its costly preparation for performance between October and January would be for naught if the funding condition precedent failed.

> The one who complains of being injured by such a false representation cannot heedlessly accept as true whatever is told him, but has the duty of exercising such degree of care to protect his own interests as would be exercised by an ordinary, reasonable and prudent person under the circumstances; and if he fails to do so, is precluded from holding someone else to account for the consequences of his own neglect.

*Mikkelson v. Quail Valley Realty*, 641 P.2d 124, 126 (Utah 1982). Here, Mr. Pache, a sophisticated businessperson readying to execute instruments binding his company to make more than $100 million in payments over several years, obviously failed to protect his own interests. Any reasonably prudent person would demand that such a significant term be inserted prior to signing the agreements, which could be easily accomplished in a matter of minutes on a word processer.

For all these reasons, GeoMet was not justified in relying on this representation.

## B.  AWSF'S PRECONTRACTUAL OUTLAY

AWSF has not produced anything resembling an expectation damages[7] calculation, instead apparently seeking to recover the expenses it incurred in preparation to perform under the agreement. Thus, AWSF seeks to be returned to the position it was in before the contract was executed—a reliance measure of damages. Reliance damages consist of "expenditures made in preparation for performance or in performance, less any loss that the party in breach can prove with reasonable certainty the injured party would have suffered had the contract been performed." Restatement (Second) of Contracts § 349 (Am. Law Inst. 1981).

But the general rule is that breach of contract damages awarded under a reliance measure must have been incurred in reasonable reliance on a contract. *See, e.g.*, *DPJ Co. Ltd. P'ship v. F.D.I.C.*, 30 F.3d 247, 250 (1st Cir. 1994) (recognizing the "common-law limitation" on reliance

---

[7] "Expectancy damages or benefit-of-the-bargain recoveries award damages for the reasonably expected value of the contract." 22 Am. Jur. 2d *Contracts* § 53 (2019).

damages that, "because reliance damages seek to measure the injured party's 'cost of reliance' on the breached contract, 'an injured party cannot recover for costs incurred *before* that party made the contract." (quoting A. Farnsworth, *Contracts*, § 12.16 (1998))). Indeed, the Restatement (Second) of Contracts defines a promisee's reliance interest as "his interest in being reimbursed for loss caused by *reliance on the contract* by being put in as good a position as he would have been in had the contract not been made." Restatement (Second) of Contracts § 344 (Am. Law Inst. 1981) (emphasis added); *see also id.* cmt. a ("The promisee may have changed his position *in reliance on the contract* by, for example, incurring expenses in preparing to perform, in performing, or in foregoing other opportunities to make contracts." (emphasis added)). AWSF made the majority of the expenditures it seeks in damages before the Build Agreements were executed in October. As a result, placing AWSF in as good a position as it was in when it made the contract does not require GeoMet to reimburse AWSF for the expenditures AWSF incurred at its sole risk.

Just as it was unreasonable for GeoMet to have relied on vague, extracontractual assurances that "it would not be [AWSF's] intent to assert breach," so too was it unreasonable for AWSF to have expended millions of dollars before any agreement was executed. Quite simply, in these factual circumstances, where the parties spent several months negotiating multiple written agreements concerning years-long obligations worth millions of dollars, AWSF expenditures were not made in *reasonable* reliance on the mere prospect that those agreements would ultimately be executed. Rather, AWSF bore the sole risk that its expenditures would be for naught.

AWSF may well have concluded that the potential gains to be had if the contracts were ultimately executed and the venture successful were so great that it was worth risking $2 million

in start-up expenditures. Or it may have speculated that if GeoMet could not raise funding for this venture, another entity could,[8] and those initial costs would be recuperated through the success of that subsequent venture. Whatever its calculus, AWSF cannot now saddle GeoMet with nearly $2 million in expenditures made in the absence of any enforceable promise.

That is not to say that the parties could not have contracted to make those precontractual expenditures recoverable as a consequence of breaching the final agreements. *See Drysdale v. Woerth*, 153 F. Supp. 2d 678, 684 (E.D. Pa. 2001) (explaining that expenses incurred before a contract is made are recoverable if "it is affirmatively shown that the defendant has assumed responsibility for them"). Surely the PPA and Build Agreements could have specified that damages flowing from the breach of those agreements are deemed to include AWSF's start-up expenditures. AWSF suggests that the PPA's effective date of April 19, 2013—five months before the agreement was executed—did just that. In support, AWSF cites cases that stand for the general proposition that parties may designate an effective date that predates an agreement's execution. None of these cases establish that expenditures made in the absence of any kind of agreement or other promise on which to rely are made reasonable by a backdated effective date, and most involve parties who had earlier arrived at a definite oral agreement, only to memorialize the terms of that agreement in the subsequent days or weeks.

But here, AWSF was not acting in reliance on a verbal agreement that had not yet been reduced to writing. Rather, the record establishes that AWSF and GeoMet were still negotiating the relevant agreements until, at the very earliest, September 3, 2013. As a matter of law, AWSF made these precontractual expenditures at its own risk, and can point to no agreement or other

---

[8] Indeed, after terminating its agreements with GeoMet, AWSF attempted to leverage the time and expense of its start-up efforts in pursuit of a nearly identical venture with a new partner, Tempus Global Data, Inc. That venture was similarly unsuccessful.

factual predicate that would make its expenditures reasonable, instead begging the question by asserting that it would not have made millions of dollars of outlays "without very good reason to believe" that GeoMet would ultimately make payments to offset those expenditures. Of course, contracting parties regularly misjudge their bargaining position or the likelihood of arriving at a meeting of the minds with a counterparty. That AWSF made significant expenditures in the absence of a contract is not evidence of its reasonableness, and more likely reflects little more than its risk appetite vis-à-vis the STORM venture.

In sum, a mere effective date, without more, cannot bear the significant meaning AWSF ascribes to it. Stated differently, the court cannot say that GeoMet contractually agreed to alter the well-established default rule that pre-contractual expenditures are not compensable in a breach of contract claim—thereby shouldering the risk of millions of dollars of liability—by virtue of an earlier effective date.[9]

But even if the PPA's backdated effective date could render AWSF's expenditures not made in reliance on any promise recoverable, the PPA itself does not contain the specific promise that was breached. Rather, GeoMet promised to make the $5,384,022 payment by its execution of the STORM 001 agreement, which contract was effective October 1, 2013. The PPA contains nothing more than an agreement to agree on the STORM 001 contract, declaring that "GMW shall enter into, maintain, and fulfill the . . . Contract No. STORM 001," clarifying that "[m]aintenance of the above contract specifically includes complying with the payments

_____

[9] April 19, 2013 appears to have been selected merely because it was the date on which GeoMet and Utah State University Research Foundation—AWSF's predecessor in this venture— mutually terminated their preferred provider agreement, which termination explained that AWSF had been created "to take over responsibility" for the STORM project, contemplating that GeoMet and AWSF "have entered/are entering into a Preferred Provider Agreement, dated April 19, 2013." (ECF No. 586-3 at 2). The agreement contemplated by the mutual termination agreement, however, was not executed until September 19, 2013.

schedule set forth therein." The PPA further provides that a failure to maintain the STORM 001 agreement amounts to a material breach entitling AWSF to terminate the PPA after a 30-day cure period.

Thus, under the PPA, GeoMet agreed to enter into and "maintain" the STORM 001 agreement. But it nowhere promised to pay AWSF $5,384,022 on January 6, 2014. As a result, while GeoMet's breach of the STORM 001 promise had the collateral effect of triggering a material breach of the PPA (thereby entitling AWSF to terminate the PPA and contract with a new partner, conduct that would otherwise be precluded by the PPA's exclusivity provision), the PPA on its own is no basis on which to rely in expending nearly $2 million.

To illustrate the relationship between the milestone payment breach and the two agreements, consider a scenario in which the parties executed the PPA but, counterfactually, failed to execute the STORM 001 agreement a little more than two weeks later. In such circumstances, there could be no argument that, by executing a preferred provider agreement imposing confidentiality and exclusivity obligations on the parties but containing no sum certain payment obligations, GeoMet intended to bind itself to make a $5,384,022 payment on January 6, 2014.

At most, by the PPA, the parties made an agreement to agree on the terms of the STORM 001 contract. And Utah follows the common law precept that "'agreements to agree' are generally unenforceable because they leave open material terms for future consideration." *See Bloom Master Inc. v. Bloom Master LLC*, 442 P.3d 1178, 1182 (Utah Ct. App. 2019) (quoting *Harmon v. Greenwood*, 596 P.2d 636, 639 (Utah 1979)). Here, the PPA leaves open *all* material terms of the STORM 001 agreement. Thus, if AWSF sought judicial enforcement of a contemplated STORM 001 agreement on the basis of the PPA alone, a court would be without

any material terms to enforce, and would therefore be compelled to deny recovery. In sum, because the PPA contains no enforceable payment promises, AWSF cannot use that agreement's backdated effective date to render its precontractual outlay reasonable.

## C. GEOMET'S "BRIDGE" PAYMENTS

After subtracting AWSF's precontractual outlay damages, AWSF is left seeking $39,030.44[10] in damages. GeoMet argues that this amount is completely offset by two payments of $125,000 it made to AWSF in September and October of 2013 to "help AWSF stay operational and make payroll" before the milestone payments came due. GeoMet's argument that these amounts should be deducted from any remaining damages would be well taken only if AWSF sought to recover expenditures it made using the proceeds of GeoMet's "bridge" payments.

But AWSF responds that GeoMet is not seeking to recover as damages expenditures made using GeoMet's payments, explaining that "AWSF's $1.9 million damages calculation simply does not include the $250,000 payment from [GeoMet]." In these circumstances, GeoMet's payments have already been used to reduce AWSF's damages by enabling AWSF to avoid expenditures it would have been forced to incur in their absence. The court can discern no principle for, in essence, deducting $250,000 from AWSF's damages twice.

## D. DIRECT VS. CONSEQUENTIAL DAMAGES

The Build Agreements forbid the recovery of "SPECIAL, INCIDENTAL, INDIRECT OR CONSEQUENTIAL DAMAGES, INCLUDING WITHOUT LIMITATION, LOST PROFIT

---

[10] This amount represents AWSF's damages incurred in October of 2013, the only expenditures made in reasonable reliance on the payment promises made by GeoMet in the STORM 001 agreement dated October 1, 2013. (ECF No. 870 at 14).

OR REVENUES."[11] GeoMet argues that AWSF's damages—consisting of the costs of "salaries associated with building and paying a team of highly-skilled managers and aerospace engineers for work on necessary preconstruction development projects related to the STORM instrument and necessary to receive [ExIm] funding"—are consequential damages foreclosed by this provision. The court disagrees.

"Damages recoverable for breach of contract include both general damages, *i.e.*, those flowing naturally from the breach, and consequential damages, *i.e.*, those reasonably within the contemplation of, or reasonably foreseeable by, the parties at the time the contract was made." *Beck v. Farmers Ins. Exch.*, 701 P.2d 795, 801 (Utah 1985). "[C]onsequential damages 'mean[] particular items of damages which result from circumstances peculiar to the case at hand.'" *Trans-Western Petroleum, Inc. v. U.S. Gypsum Co.*, 379 P.3d 1200, 1207 (Utah 2016) (second alteration in original) (quoting *Prince v. Peterson*, 538 P.2d 1325, 1328 (Utah 1975)). "[Consequential damages] 'are the natural, but not the necessary, result of an injury . . . .'" *Id.* (quoting *Cohn v. J.C. Penney Co.*, 537 P.2d 306, 307 (Utah 1975)); *see Mahmood v. Ross*, 990 P.2d 933, 937 (Utah 1999) (defining consequential damages as those that are "not an invariable result of breach"). "Consequential or special damages for breach of contract are those claimed to result as a secondary consequence of the defendant's nonperformance." Dan B. Dobbs, *Law of Remedies* § 12.4(1) (2d ed. 1993).

The elusive distinction between general and consequential damages typically arises only in breach of contract actions seeking expectation damages, and there appears to be no Utah case

---

[11] As explained above, AWSF's reliance damages are reasonable, and therefore recoverable, only to the extent they were made in reliance on the payment promises contained in the Build Agreements. Thus, any contractual limitation on damages must be found in the Build Agreements. Nevertheless, the PPA similarly forecloses either party from recovering "any special, consequential, lost profit, expectation, punitive or other indirect damages in connection with any claim arising out of or relating to this Agreement."

applying these concepts to the recovery of reliance damages. Despite this lack of guidance, the court has little trouble concluding that AWSF's damages do not fall into the handful of damages categories deemed consequential, special, or indirect. First, AWSF's reliance expenditures were plainly "necessary" to perform under the Build Agreements (and thus were an "invariable" result of GeoMet's breach). Additionally, AWSF does not seek damages that are "secondary" to the Build Agreements (for example, AWSF does not claim damages flowing from a third-party contract it could not fulfill due to GeoMet's breach). Finally, the court can find nothing "peculiar" or "unique" about AWSF's claimed damages—any manufacturer that contracts to design and construct these sensors would have incurred the same costs in preparing to perform under the Build Agreements. In sum, GeoMet has not shown how the Build Agreements' damages limitation forbids AWSF's recovery of its reliance expenses.

### E. GeoMet's "First Breach" Defense

Next, AWSF seeks summary judgment on GeoMet's "first breach" defense. The Utah Supreme Court holds that "under the 'first breach' rule[,] 'a party first guilty of a substantial or material breach of contract cannot complain if the other party thereafter refuses to perform." *CCD, L.C. v. Millsap*, 116 P.3d 366, 373 (Utah 2005) (quoting *Jackson v. Rich*, 499 P.2d 279, 280 (Utah 1972)). GeoMet asserts that its failure to make the milestone payments required by the Build Agreements was excused by AWSF's earlier breaches of the PPA's exclusivity and confidentiality provisions.[12]

GeoMet's first breach affirmative defense fails because even if GeoMet could establish that AWSF's alleged breaches of those provisions were "substantial or material," thereby

---

[12] The PPA's exclusivity term forbids AWSF from "enter[ing] into any contracts within the Scope of Services for any project similar to or competitive with the Project with any entity other than [GeoMet]/Affiliate." Intuitively, the confidentiality provision prevents both parties from disclosing the PPA's terms.

excusing GeoMet from its obligations under the PPA, those breaches nowise entitled GeoMet to cease performance under the Build Agreements. GeoMet has nowhere alleged that AWSF materially breached either of the Build Agreements, so even if AWSF is found to have materially breached the PPA, GeoMet cannot, as a matter of law, use that breach to excuse its nonperformance under the separate Build Agreements.[13]

## F. AWSF'S DAMAGES

In the face of AWSF's motion for summary judgment on the amount of its damages, GeoMet makes no challenge to the accuracy of AWSF's damages calculations, instead presenting purely legal arguments in defending against recovery. Having reduced AWSF's damages on the basis of some of those legal arguments and rejecting others, AWSF is entitled to recover the remaining amounts, as a matter of law, as a result of GeoMet's failure to adduce any factual disputes running to AWSF's calculation or proof of damages.

## III.    ORDER

For the reasons articulated, the parties' motions for summary judgment (ECF Nos. 876 & 870) are **GRANTED IN PART and DENIED IN PART**. Specifically:

1. AWSF is entitled to summary judgment on GeoMet's fraudulent inducement and "first breach" affirmative defenses.

2. GeoMet is entitled to summary judgment on its argument that AWSF may not recover expenditures incurred before October 1, 2013.

---

[13] Both parties seek to blur the distinction between the PPA and the Build Agreements when doing so would bolster their theories. To reiterate the relationship between the agreements: although the PPA is deemed terminable—at AWSF's election—upon GeoMet's failure to enter into or "maintain" the Storm 001 contract, there is absolutely nothing in the PPA or the Build Agreements to suggest that a breach of the PPA has any effect on the Build Agreements.

3. AWSF is entitled to summary judgment on its breach of contract counterclaim in the amount of $39,030.44

4. In all other respects, the parties' motions for summary judgment are **DENIED AS MOOT.**

Signed August 20, 2019

BY THE COURT

_____
Jill N. Parrish
United States District Court Judge